# KABIL DEVELOPMENTS CORPORATION,
### *Respondent,*

*v.*

## MIGNOT et ux, *Appellants.*
## (TC 74-769-L, SC 24651)
#### 566 P2d 505

Donald H. Coulter of Myrick, Coulter, Seagraves, Nealy & Myrick, Grants Pass, argued the cause and filed briefs for appellants.

W. H. Hampton, III, of Hampton & Lombard, Ashland, argued the cause and filed a brief for respondent.

Before Denecke, Chief Justice, and Bryson, Linde, and Campbell, Justices.

LINDE, J.

## LINDE, J.

Defendants appeal from a judgment awarding plaintiff damages for breach of contract. The plaintiff, Kabil Developments Corporation, alleged an oral agreement that Inland Helicopters, a business owned by defendants E. W. and Peggy Mignot, would provide Kabil with helicopter services needed for a construction job which Kabil contracted to perform for the United States Forest Service. Defendants denied that there was a contract. In addition to a general denial, they pleaded that their agent, Mr. Honeycutt, had stated he would have to examine and approve the job site for safe, practical, and economically feasible operations before accepting the job, and that after this inspection, Honeycutt had told Kabil the site was neither safe for the helicopter nor economic for the plaintiff. It is undisputed that Inland did not perform and that Kabil obtained helicopter services elsewhere at a higher cost. A jury found a verdict for plaintiff and assessed damages at $4,771.85.

The issue on appeal, detailed in eight assignments of error, is whether the trial court's rulings on certain testimony and instructions permitted the jury erroneously to find a contract on the basis of subjective intentions and expectations rather than on the objective manifestations of mutual assent.

As to the testimony, defendants' main attack arises from the following excerpt from the examination of Mr. Munroe, Kabil's vice president. Munroe had testified to a discussion with Honeycutt on June 10 concerning the proposed job, the helicopter equipment, the approximate time required, and Inland's quoted hourly rates for the service. Plaintiff Kabil concedes that no contract was made at that time, but the quoted figures were used in preparing Kabil's bid on the construction project. At a subsequent meeting, Munroe and Kabil's president told Honeycutt that Kabil's bid had been accepted and informed him of the timetable for completing the work. Munroe testified

that Honeycutt said Inland would do the job. Later in his testimony, this exchange took place:

Q   Mr. Munroe, going back to the meeting of June 25th, that was where you and Mr. Klovstad and Mr. Honeycutt were all present, after your meeting did you feel at that time in your mind that Kabil Development Corporation was obligated to give the helicopter work to Inland Helicopter?

MR. COULTER: Objection, Your Honor. What he felt in his mind wouldn't be at all probative of whether a contract was or was not formed.

THE COURT: I think he can testify as to what his feelings as to whether or not he was bound. As I understand it, the question was whether or not Kabil Development Company felt that they were bound by the contract.

MR. HAMPTON: That's correct, Your Honor.

MR. COULTER: And it wouldn't make any difference, Your Honor. I think it is the objective manifestations of the contract that are the only elements that are involved in this case. What is subjective in the mind of an offeror or an offeree and not expressed or communicated does not have probative weight of establishing a contract.

THE COURT: He may answer.

A   Yes, I felt that we were obligated to Inland Helicopter, and equally I felt they were obligated to us.

Defendants contend that to allow this testimony permitted the jury to assume that "unexpressed convictions—purely subjective reactions—had probative bearing on the fundamental issue of whether or not an oral contract had been formed." Plaintiff responds that subjective intention, though not itself determinative, "is not totally irrelevant and in fact can be considered along with all of the other factors that determine whether or not a contract was formed."

These opposing contentions echo debates that occupied the jurisprudence of contracts a half-century and more ago. Scholars attributed 19th-century views of contracts as arising from conscious, "subjective," agreement on the same undertaking—the "meeting of

the minds"—to that century's philosophical individualism: An obligation that is created only by the free will of autonomous parties depends on showing that will.[1] The later "objective" theory placed greater emphasis on one party's right to rely on the reasonable expectations created by the apparent agreement of the other, an emphasis also attributed to the needed security of contracts in a commercial economy.[2] Its greatest advocate, Professor Williston, led the objective theory to triumph as Reporter for the American Law Institute's Restatement of Contracts,[3] though not without protests.[4] From the bench, the most quoted statement of the objective theory was then-District Judge Learned Hand's:

> . . . A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else then the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. . . . *Hotchkiss v. National City Bank of New York,* 200 F 287, 293 (SD NY 1911).

35 years later Judge Jerome Frank, concurring in a decision written by Judge Hand on the Court of

---

[1] *See, e.g.* Cohen, *The Basis of Contract,* 46 Harv L Rev 553, 575-578 (1933); Patterson, *Equitable Relief for Unilateral Mistake,* 28 Colum L Rev 859, 861-867 (1928); 1 Corbin, Contracts, § 106 (1963).

[2] *See, e.g.,* Cohen, *supra* n 1, at 578-580; Friedman, Contract Law in America 86-87; *compare* Horwitz, *The Historical Foundations of Modern Contract Law,* 87 Harv L Rev 917 (1974).

[3] Williston, *Mutual Assent in the Formation of Contracts,* 14 Ill L Rev 85 (1919); Williston, Contracts, §§ 20-21, 94-95 (1920); Restatement of Contracts §§ 3, 5, 20, 21 (1932). These sections are retained in principle in Restatement of Contracts 2d (Tent. Draft ##1-7, 1973).

[4] *See, e.g.,* Whittier, *The Restatement of Contracts and Mutual Assent,* 17 Calif L Rev 441 (1929); Sharp, *Williston on Contracts,* 4 U Chi L Rev 30 (1936). Professor Patterson considered the Restatement's "tight articulation" of such terms as "manifestation of assent" to be "delusive." Patterson, *The Restatement of the Law of Contracts,* 33 Colum L Rev 397, 406 (1933).

Appeals, devoted 11 pages to arguing that "the objectivists also went too far", first, in treating all kinds of agreements alike, and second, in excluding consideration of the actual intent of the parties as legally irrelevant for any purpose. *Ricketts v. Pennsylvania R. Co.,* 153 F2d 757, 761, 164 ALR 387 (2d Cir 1946). Professor Corbin, having earlier rejected criticisms of the Restatement's objective theory,[5] later concluded that the law of contracts cannot be wholly explained on either a subjective or an objective theory. 1 Corbin, Contracts, § 106 (1963).

■ In practice the choice of theory is posed primarily by such issues as the treatment of offers accepted after an uncommunicated revocation, of unilateral or mutual mistake, and above all, of interpretation, as in the *Hotchkiss* case quoted above.[6] That has been true in Oregon. This court has stated, in cases involving the interpretation of the parties' agreement, that it "subscribes to the objective theory of contracts." *Harty v. Bye,* 258 Or 398, 403, 483 P2d 458 (1971) and cases cited. When the parties concededly had entered into some agreement for plaintiff's services but disputed how much he was to be paid, it was held proper to refuse a requested instruction that "there must be a meeting of the minds of said parties. They must have both understood the situation alike." This instruction

---

[5] Corbin, *The Restatement of the Common Law by the American Law Institute,* 15 Iowa L Rev 19, 31-35 (1929).

[6] Judge Hand's opinion, which dealt with the customary interpretation of certain banking transactions, continued:

. . . [W]hatever was the understanding in fact of the banks, and of the brokers, too, for that matter, of the legal effect of this practice between them, it is of not the slightest consequence, unless it took form in some acts or words, which, being reasonably interpreted, would have such meaning to ordinary men. Of course, it will be likely that, if they both do understand their acts in the same way, usual men would have done so, too. Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effect by either party thereafter, however truthful, is material. The rights and obligations depend upon the law alone. *Hotchkiss v. National City Bank of New York, supra,* 200 F at 293-294.

"could readily have misled the jury", the court said. "The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts." *Kitzke v. Turnidge,* 209 Or 563, 572-573, 307 P2d 522 (1957). True, disputes over interpretation differ from the present case insofar as they presuppose that the parties reached an enforceable agreement, which implies *some* shared assumptions to be interpreted. Nevertheless, the premise adopted in *Kitzke* for the interpretation of contracts surely must apply also to their formation, to test whether the parties agreed as well as on what they agreed.

But accepting the test of manifested assent regardless of subjective intent does not dispose of the present question. It need not follow that the test also compels keeping a party from testifying whether he thought at the time of the events that he was in fact entering into an agreement. Here the witness was permitted to testify that he did, indeed, act in the belief that he was making a contract.[7] More often, no doubt, the subjective testimony seeks to deny or vary the objectively manifested agreement asserted by the opposing party, which is what concerns the objective theorists. It is not clear from Judge Hand's words in *Hotchkiss, supra,* whether he would have admitted the testimony of the twenty bishops at all.

Usually, however, probative testimony is admissible unless some rule compels its exclusion, and it is difficult to deny that a person's own view of his position in a negotiation can bear on his behavior as perceived by other parties. That perception is, of course, the crux of the objective theory, despite an occasional statement that the parties' manifestations are to be judged by the standards of a "reasonable man;"[8] the staunchest "objectivist" would not let a

---

[7]The final words of Munroe's answer went beyond the question, but no motion was made to strike that part of the answer.

[8]See 1 Corbin, Contracts, § 106 (1963), *compare* Hand, J., in *Hotchkiss, supra,* note 6.

jury hold two parties to an apparently manifested agreement if neither thought the other meant to assent.[9] When the dispute concerns an unwritten agreement, the conclusion that the parties manifested mutual assent must be constructed from evidence of their negotiations or other past conduct. It must be constructed from their "communications and overt acts," not their "undisclosed intents and ideas," *Kitzke v. Turnidge, supra;* but in face-to-face negotiations, words are not everything, and a factfinder might well believe that what a party thought he was doing would show in what he did. Thus it was not error to permit Munroe to testify to his own sense of the state of negotiations, as long as the jury was not misled into treating this testimony, in its context, as something more than evidence bearing on the behavior and the perceptions of the parties to the negotiation.

■ We are not persuaded that the jury was so misled in this case. The jury was instructed that their conclusion depended upon an "objective test", under which "the manifestation of a party's intention, rather than the actual or real intention, is controlling"; that the essential agreement "is not determined by the secret intentions of the parties, but by their expressed intentions, which may be totally different." The instruction as a whole might have been stated in different ways, but as given it met the point of the present objection. Defendants offered a number of additional instructions designed to counteract what they believed to be the prejudicial effect of the quoted testimony and also to emphasize their position that the dealings between the parties' representatives did not ripen into a firm agreement. Some of the requested instructions are unexceptionable statements of law,

---

[9] *See* Murray, Contracts, 30-32 (1974). More difficult problems involve the deception or reliance of persons not parties to the apparent agreement, *id.* at note 17; Comment, *Admissibility of Parol Evidence Showing that Contract in Writing Was Executed Only as Sham,* 33 Mich L Rev 410 (1935).

but that does not make refusal to give them reversible error when the point has been otherwise covered.

■   Finally, defendants assign as error the trial court's refusal to instruct the jury to return a verdict for defendants. They appeal from the denial of that request, which they treat as equivalent to a motion for a directed verdict, on the ground that the evidence did not show a sufficiently definite understanding to constitute a contract. But no basis for the requested instruction was presented to the trial court, and the court had no opportunity to rule on this contention, so it was not error to reject it. *See Remington v. Landolt,* 273 Or 297, 301-303, 541 P2d 472 (1975) and cases there cited, especially *Vancil v. Poulson,* 236 Or 314, 320, 388 P2d 444 (1964).

Affirmed.