Argued and submitted April 9, affirmed on appeal; reversed and remanded on
cross-appeal August 20, 2003

Gene HUGHES
and Penny Hughes,
*Respondents - Cross-Appellants,*

*and*

Edward HUTSELL
and Barbara Hutsell,
*Respondents - Cross-Respondents,*

*v.*

Kurt MISAR
and Colleen Misar,
*Appellants - Cross-Respondents.*

98C019850; A114644

76 P3d 111

Margaret H. Leek Leiberan argued the cause and filed the briefs for appellants - cross-respondents.

Christopher H. Kent argued the cause for respondents - cross-appellants. With him on the briefs was Hafez Daraee.

No appearance for respondents - cross-respondents.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Schuman, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendants appeal a judgment in which the trial court found that plaintiffs and defendants had settled their original disputes in this case, determined the terms of the settlement, and ordered the parties to take certain steps to carry it out. Defendants argue that they only discussed a proposed settlement that would not become binding until they signed the final settlement documents, which they never did. Plaintiffs Hugheses cross-appeal for attorney fees under the terms of the settlement as the court found it to exist.[1] We affirm on the appeal and reverse and remand on the cross-appeal.

We state the facts as we find them on *de novo* review.[2] Plaintiffs Gene and Penny Hughes and Edward and Barbara Hutsell and defendants Kurt and Colleen Misar[3] all own homes in the Glen Harbor Heights subdivision in northwest Portland. All parties reach their homes by a private gravel road that connects with an unimproved city street a short distance from Germantown Road. The Hugheses moved into their home before 1980, which was also before the other houses were built. The Misars were the last to move to the area, in 1996, when they purchased an existing house.

In 1983, either the Hugheses or the developer of the subdivision owned all of the land to which the road provides access. That year, the owners entered into a Roadway Easement and Roadway and Gate Maintenance Agreement that created an easement over the road and required the owners

---

[1] Plaintiffs Hutsells do not appear on appeal.

[2] Plaintiffs argue that the court based its judgment on their claim for breach of the settlement agreement, that that claim is legal in nature, and that, therefore, our review is for any evidence to support the trial court's judgment. However, in their claim plaintiffs sought an injunction requiring defendants to execute the settlement agreements, as well as "such other relief as the court deems just and equitable to enforce the terms of the agreement." As defendants suggest, the claim is essentially one for specific performance of the settlement agreement. It is therefore in equity and our review is *de novo*. ORS 19.415(3). We note, however, that on *de novo* review we essentially agree with the trial court's view of the facts.

[3] At times, we will refer to the individual parties by their first names. Also, each married couple generally acted as a single unit throughout these proceedings, and we will occasionally refer to each couple as a "party" in the singular.

of houses on the benefitted lots to pay the costs of maintaining it. The other parties' houses were built in the immediately following years; several lots remain unbuilt. Before 1996, Gene Hughes took the primary responsibility for maintaining the road under the agreement. He owned the necessary equipment, did most of the physical work, and prorated his costs among the three homeowners who used the road. After defendants moved into their home, a number of disputes arose between them and Gene concerning the maintenance of the road. Those disputes led plaintiffs to file this action in 1998, seeking damages for defendants' failure to participate in maintaining the road. In their answer, defendants asserted a number of counterclaims, and plaintiffs then amended their complaint to add additional claims.

The parties scheduled the deposition of Penny Hughes for November 15, 1999. Before beginning the deposition, they decided to attempt to settle their disputes. After considerable discussion, they reached an agreement on what they believed to be the essential terms of the settlement; as a result, the deposition did not occur. The Hugheses' attorney wrote out the agreed terms on two sheets of ruled paper, headed "Terms"; the Hugheses, their attorney, Kurt Misar, and the Misars' attorney all signed the document. The Hutsells were not present, but they received a copy of the document by facsimile and orally agreed to the terms. Colleen Misar had to leave before the discussions were complete, and Kurt signed the document on her behalf, although without her express authority. Kurt later testified that he did not intend to agree to the terms listed on the sheets as a settlement that would be binding before the preparation and execution of the appropriate documents, but he did not communicate those reservations at the time. The other parties believed the terms to be binding immediately.

The settlement terms provided that the roadway would be paved, with each couple paying a third of the cost. The terms sheet stated the cost of paving as $20,000, which was Gene Hughes's estimate based on bids that he had received for similar projects. It did not mention permits or environmental review. Defendants agreed to pay the Hugheses $5,400, and the settlement resolved a number of minor disputes, primarily between the Hugheses and the

Misars. The most important additional part of the agreement was that the parties would create a homeowners' association and enter into a new road maintenance agreement. The officers of the association would rotate annually; two-thirds of the members could authorize expenditures up to $4,500, but for expenditures in excess of that amount the dissenters could request an arbitration procedure. New users of the road would participate on a pro rata basis. The settlement included additional details concerning the operation of the association, and the parties informally agreed that Kurt Misar would act as the first chairman. Finally, the settlement provided for mutual releases of all claims.[4]

Shortly after the parties executed the terms sheet, Gene Hughes obtained a bid for paving the road at a cost of $21,000. The Hugheses then left for Florida while their attorneys began work on preparing the documentation to implement the settlement. That documentation consisted of a settlement agreement and a mutual release, a restated roadway maintenance agreement, and the articles of incorporation and bylaws of the homeowners' association. Defendants did not accept the original proposals, and the parties exchanged several drafts without reaching a full agreement regarding them. The Hugheses returned to Portland in January because of what they believed was the failure to implement the existing settlement. In March 2000, all parties and their lawyers met on the road itself to discuss the situation. At that meeting, they endeavored to resolve all outstanding issues and reached what Penny Hughes described as the "final, final" agreement. Thereafter, the Hugheses' attorney sent a revised version of the settlement documents to defendants' attorney, who responded on March 29, 2000, with a request for several modifications.

Gene had become increasingly frustrated over the delays and cost involved in documenting the settlement; he considered the documentation to be simply lawyer-imposed technicalities that were irrelevant to the essential terms of

---

[4] Kurt was concerned about what permits were necessary for paving the road; he agreed to check into that issue but did not do so until some time in January 2000. He apparently received different information from different sources. We cannot tell from the record what permits, if any, are necessary.

the November 15 agreement. Although he testified that he believed that defendants' proposed changes were insignificant (a point with which Kurt generally agreed), defendants' request for further modifications led him to ask his attorney to return to the November 15 terms and, generally, to simplify everything. Gene believed that the road should have been paved soon after he got the bid, and he was particularly upset about the delay in paving it. His attorney made a number of changes to the documents, particularly concerning the conditions for paving the roadway, and plaintiffs signed the documents as revised. The attorney sent the revised documents to defendants' lawyer on April 12, 2000. Defendants insisted that the changes gutted the settlement, particularly with regard to paving the road without firm requirements for permits that they thought were necessary, and they refused to sign the documents. Plaintiffs then amended their complaint in this action to add a claim to enforce the settlement, and that claim was tried to the trial court.

The trial court found that the parties had settled the case and that the version of the documents that the Hugheses' attorney sent defendants' attorney after the March meeting, as modified by the changes that defendants requested on March 29, expressed the terms of the settlement. The court therefore entered a judgment determining that those documents constituted the parties' settlement. The judgment required that the road be paved in accordance with all applicable legal requirements and by a properly licensed and bonded contractor. It also awarded the Hugheses judgment against defendants for $5,400, and it dismissed all other claims and counterclaims with prejudice. The court subsequently denied the Hugheses' motion, which they based on a provision of the written settlement agreement that the attorneys had drafted, and the trial court had adopted, for an award of attorney fees. Rather, if determined that "that aspect was not sufficiently agreed upon in the settlement documents for the Court to enforce attorney fees."

In their first assignment of error, defendants argue that the trial court erred in holding that the documents that it identified constituted a binding settlement agreement. They argue that there is no evidence that all the parties expressly consented to all of the provisions of the settlement

that the court identified. In particular, they assert that there is no evidence that defendants agreed to all of the terms of the documents that the Hugheses' lawyer sent after the March meeting and that there is no evidence that plaintiffs agreed at the time to all of the modifications of those documents that defendants proposed in response.[5]

■    The unstated general premise of defendants' argument on appeal is that the parties did not intend their settlement to be legally binding until they expressed it in more formal and complete written documents to which all parties agreed and that all parties signed. We do not find that to be the parties' intention. Rather, we find that the parties intended the November 15 settlement to be binding immediately and that they intended the subsequent documentation to reflect and implement their agreement. When parties agree on the essential terms of a contract and there is nothing left for future negotiations, the fact that they also intended there to be a future writing that expresses their agreement more formally does not affect the immediately binding nature of the agreement. *Britt v. Thorsen*, 258 Or 135, 137, 481 P2d 352 (1971).

■    For example, in *Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 903 P2d 375 (1995), *modified on recons*, 138 Or App 428, 908 P2d 850 (1996), the attorneys for the parties reached an agreement on the essential terms of the settlement of the defendant's employment dispute with the plaintiff. They wrote down those terms on a paper that both attorneys signed. The defendant subsequently accepted the settlement terms. When the defendant thereafter repudiated the settlement, the plaintiff filed an action for specific performance. We held that the defendant's prior acts of acceptance were sufficient to make the settlement immediately binding. We rejected her argument that she did not intend the settlement to be binding until she had signed a written settlement agreement; rather, we observed that the initial question was a question of fact: when did the parties intend

---

[5] It is clear, however, that *defendants* agreed to the precise terms that the court identified—plaintiffs' drafts with defendants' proposed modifications. It is also clear that plaintiffs agreed to their own drafts and that they believed defendants' proposed modifications to be insignificant.

their agreement to become binding? We held that the objective manifestation of the parties controlled. 136 Or App at 569-72. We concluded that the settlement agreement was enforceable because the defendant's actions objectively manifested an intent to be bound before the written settlement agreement was prepared.[6]

■　This case is similar to *Kaiser Foundation Health Plan*. Here, the parties agreed on the essential terms of the settlement on November 15, but it was necessary to draft documents to implement that agreement. All available parties and all available attorneys signed the terms sheet. In the absence of some communicated condition regarding the postponement of the binding effect of their mutual assent, such as a provision in the terms sheets or a statement by one of the parties, the objective meaning of the parties' action was that the agreed terms were binding immediately. Cancelling the scheduled deposition of Penny Hughes supports that conclusion; a deposition would be unnecessary if the parties had intended to settle the case. Kurt Misar's testimony that he did not intend his signature to make the settlement immediately binding does not affect that conclusion because he did not communicate that reservation at the time. Contracts are based on the objective manifestations of the parties, not their uncommunicated subjective intents. *Kabil Developments Corp. v. Mignot*, 279 Or 151, 157, 566 P2d 505 (1977).

Nonetheless, defendants emphasize that the November 15 agreement required extensive implementing documentation, including a formal settlement agreement, a new road maintenance agreement, and the creation of a homeowners' association. The importance of those documents, they argue, indicates that the November 15 agreement is not enforceable. Defendants' arguments are not persuasive.

In the abstract, there are several possible ways in which a preliminary agreement may be binding despite the

---

[6] Our holding is consistent with the general rule of contract law that parties may intend a writing simply as a memorial to express their already consummated contract. If they fail to agree on the writing the contract is still valid. *See* Arthur Corbin, 1 *Corbin on Contracts*, § 2.9, 156 (Joseph M. Perillo rev ed 1995).

need for extensive subsequent documentation. First, the documentation may involve standard provisions that the parties are deemed to have incorporated into the specific terms of their settlement. *See Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 292, 213 P2d 177, 215 P2d 380 (1950) (dealership contract was valid immediately pending issuance of written dealership franchise). Second, to the extent that the parties have not made their intent completely clear, the court may be able to carry their intent into effect by filling in any gaps in their initial agreement through the use of " 'courageous common sense and reasonable implications of fact.' " *Van v. Fox*, 278 Or 439, 446, 564 P2d 695 (1977) (quoting Arthur Corbin, 5A *Corbin on Contracts* § 1174, 279-83 (1964)). Third, parties who agree on the essential terms of a contract may intend those terms to be binding and, at the same time, implicitly agree to bargain in good faith on the remaining terms. That fact does not prevent a court from enforcing the parties' agreement. *See Van*, 278 Or at 449 (law implies duty to negotiate additional terms in good faith); *see also* Corbin, 1 *Corbin on Contracts*, § 2.9, 161 (Joseph M. Perillo rev ed 1995). Finally, in some circumstances, when the parties have bargained to an understanding but have not agreed with respect to an essential term, the court may imply a reasonable term. *Harrisburg Ed. Assn. v. Harrisburg Sch. Dist. #7*, 186 Or App 335, 345-46, 63 P3d 1176, *rev pending* (2003).

■    In this case, the parties implicitly agreed to bargain in good faith to produce the documentation necessary to implement their agreement. Although they did not reach a formal agreement on that documentation, their initial agreement and subsequent actual negotiations give a basis for applying one or more of the theories that we described in the previous paragraph to complete the work that they implicitly contemplated and in fact essentially completed. Near the end of March, all parties met on the road and reached a "final, final" agreement. That meeting concerned not only the issues that they specifically discussed, but it occurred in the context of the extensive documentation about which they were currently negotiating and on which they were close to agreement. The purpose of the documentation was to implement the November 15 agreement, and the purpose of the March

meeting was to resolve the remaining issues with that agreement. Thus the March discussion also functioned as an agreement that implicitly included the fundamental nature of the existing documentation.[7] The drafts that the Hugheses' attorney *thereafter* sent to defendants' attorney implemented both the underlying November agreement and the confirming March agreement. In response, defendants accepted those drafts subject to the specific changes that they requested. As Gene Hughes testified, and as all parties recognize, those changes were minor in nature and did not affect the essential terms of the agreement.

We conclude, therefore, on these facts that the parties completed memorializing their agreement with defendants' attorney's March 29 letter. Although plaintiffs, primarily as a result of Gene's frustration, thereafter proposed modifications in response to that letter, that action did not affect the nature of the March letters as the full expression of the completion of the settlement made at the March meeting. The completed settlement became binding at the March meeting, and the documentation gave expression to that completed agreement.

Defendants raise two additional issues concerning the obligation to pave the road. They argue, first, that the $20,000 provided in the terms sheet for paving the road was the result of a mutual mistake because it did not include the expenses that would arise from what, they argue, is the necessity of obtaining city and environmental approvals. The problem with that argument is that we cannot find from the record either that such approvals are necessary or what the cost of any required approvals would be. Defendants' argument thus fails because of a lack of evidence of a mutual mistake that was material to the parties' bargain. Defendants argue, second, that Gene Hughes concealed a 1980 letter from the city that required him to pave the road if any new homes were built and that they would not have entered into

---

[7] Defendants argue that the November 15 terms sheet did not bind Colleen Misar because she was not present when Kurt signed the sheet on her behalf. Colleen was present at the March meeting and agreed to the "final, final" settlement. She thereby bound herself to the settlement, even assuming that she was not bound in November.

the agreement if they had known about the letter. At trial, Gene explained that the developer, not the Hugheses, owned the road at the time of the letter and that, after he received it, he explained the situation to the city. Although the Hutsells' and Misars' houses were built within a few years after the letter, the city did not require him to pave the road. He forgot about the letter until he discovered it while going through his records as part of the litigation process. We are not persuaded by the evidence either that Gene concealed the letter or that it was material to the parties' agreement.

We turn to the Hugheses' cross-appeal, in which they seek attorney fees from defendants. Their claim is based on a provision in the settlement agreement that was part of the documentation of the parties' settlement. The November 15 terms sheet does not mention attorney fees. However, there was such a provision in all the drafts of the written settlement agreement, and defendants did not object to it. The final version of the written settlement agreement provides for attorney fees "[i]f any action or other proceeding shall be instituted relating to any term or condition of this Agreement[.]" We have already held that the parties agreed on the essential aspects of the documentation at the March meeting. As a result, the attorney fees provision became effective at that time; however, it can apply only to breaches of the agreement that occurred thereafter. Because the Hugheses have successfully enforced the terms of the settlement agreement, they are entitled to attorney fees that they incurred as a result of defendants' breaches after the effective date of the written documentation.[8] We remand to the trial court to determine the amounts, if any, involved.

Affirmed on appeal; reversed and remanded on cross-appeal.

---

[8] The Hugheses are not entitled to fees related to the continuing negotiations over the details of the documentation. The Hugheses do not claim that defendants breached their implied obligation to negotiate in good faith, only that they breached their obligation to accept the completed agreement and their duties under it.