Argued and submitted March 25, 2004, affirmed on appeal; reversed on cross-appeal; award of attorney fees to Fong reversed September 21, respondent - cross-appellant's motions for reconsideration and for an extension of time to file petition for attorney fees and costs filed September 30, and appellants - cross-respondents' response to petition for reconsideration and cross-petition for reconsideration filed November 4, 2005, allowed by opinion January 18, 2006 See 203 Or App 768, 126 P3d 1254 (2006)

## KEN HOOD CONSTRUCTION CO.,
an Oregon corporation,
*Plaintiff,*

*v.*

## PACIFIC COAST CONSTRUCTION, INC.,
an Oregon corporation;
Fong Holdings, LLC,
an Oregon limited liability company;
Peter Fong,
an individual;
and Real Estate Exchange, Inc.,
an Oregon corporation,
*Defendants.*

## PACIFIC COAST CONSTRUCTION, INC.,
an Oregon corporation,
*Cross-Claim-Plaintiff, Respondent - Cross-Appellant,*

*v.*

## FONG HOLDINGS, LLC,
an Oregon limited liability company;
and Peter Fong, an individual,
*Cross-Claim-Defendants, Appellants - Cross-Respondents.*

## C010645CV; A119153

120 P3d 6

Lindsey H. Hughes argued the cause for appellants - cross-respondents. With her on the briefs was Keating Jones Bildstein & Hughes, P.C.

Elizabeth Yeats argued the cause for respondent - cross-appellant. With her on the briefs was Seizer, Yeats, Mills & Zwierzynski, LLP.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

**ORTEGA, J.**

This case arose after a deal to build a restaurant in Washington County fell apart. A subcontractor, Ken Hood Construction Co. (Ken Hood), originally asserted claims against the general contractor, Pacific Coast Construction (Pacific Coast); the developer, Fong Holdings, LLC and Peter Fong (Fong); and a real estate holding company. Among the various claims asserted by the parties, Pacific Coast and Fong asserted cross-claims against each other. Only those claims were at issue at the bench trial. After the trial, the trial court entered a judgment and a supplemental judgment that, among other things, (1) found in favor of Fong on Pacific Coast's breach of contract claim (though it found in favor of Pacific Coast on its claims against Fong for *quantum meruit* and unjust enrichment); (2) found in favor of Pacific Coast on Fong's claims for timber trespass; (3) found in favor of Fong on Pacific Coast's lien foreclosure claim; (4) awarded attorney fees to Pacific Coast as the prevailing party on Fong's timber trespass claim; and (5) awarded attorney fees to Fong on Pacific Coast's contract and lien foreclosure claims, but in an amount that was 75 percent lower than what Fong had requested. On appeal, Fong makes four assignments of error; Pacific Coast makes two assignments of error on cross-appeal. For the reasons explained below, we affirm on Fong's appeal and reverse on Pacific Coast's cross-appeal. We also reverse one award of attorney fees.

Except where noted, the underlying facts are undisputed. In 1999, Fong bought property in Washington County to develop a restaurant. An economist by training, Fong had no real estate development experience before buying the Washington County property. He retained the Scott/Edwards Architecture firm (Scott/Edwards) to design the restaurant, and the project was put out to bid in the summer of 2000. As is customary in the industry, the bid package included a form of contract; both that contract and the bid instructions were standard documents published by the American Institute of Architects (AIA). Pacific Coast's project manager, Josh Komp, testified that it is customary in competitively bid contracts to include all the terms and conditions in the bid package, leaving nothing open to negotiation. On the "Bid Form," the following language appeared:

"Notwithstanding any delay in the preparation of the formal Contract Agreement, the undersigned agrees to commence work on the Project within ten (10) days following receipt of written notice of acceptance of bid from Owner.

"The undersigned, if awarded the Contract by the Owner shall, within five (5) days after notice of award and receipt of Construction Contract Agreement Forms from the Owner, sign and deliver to the Owner all required copies."

Those are commonly used provisions and were intended to require the contractor who is awarded the work to proceed with the work while the written contract is being finalized. Although the form of contract included some blanks, most of the data that went into the blanks could be found elsewhere in the project manual.

In early September, about a month after Pacific Coast submitted its bid, Fong sent Pacific Coast a letter accepting that bid (the award letter):

"It is my pleasure to inform you that your company has been chosen over tough competition to build the restaurant. It is my intention to sign a contract with you based on our verbal agreement that the price of the project is increased to $1,259,888.00 which reflects your obligation to provide a performance bond and payment bond on the project."

Both Komp and Pacific Coast's president, Jeff Espedal, believed that the parties had a contract for the project at that point. Fong, on the other hand, testified that he intended by his letter to inform Pacific Coast that he would enter into negotiations with it, rather than with another bidder. Fong also testified, however, that he intended to enter into a written contract with Pacific Coast based on the documents that were put out to bid. A provision in the bid package stated, "After the Owner determines that a contract is to be awarded, the contract will be awarded at his discretion" on the basis of a number of factors.

The day after sending the award letter, Fong met with Komp, Espedal, and representatives of Scott/Edwards at the Scott/Edwards offices. Several necessary permits had yet to be obtained, but most or all were ready to be picked up from the various agencies and the parties agreed that Fong would be responsible for doing that. The parties also agreed

that work should begin on anything that could be done before permits were obtained, because time had been lost in the bidding process and the excavation and concrete work needed to be done before the winter weather set in.[1] Komp and Espedal testified that Fong did not object or express any concern with proceeding in that fashion, and Andy Kraus of Scott/Edwards also testified that Fong was clear that trees could be removed from the site before the permits were official. According to Komp, the parties specifically discussed going ahead with tree removal; Pacific Coast would mark the trees to be removed, and Fong would come to the property and verify that the right trees had been identified. Two Scott/Edwards representatives, Kelly Edwards and Andy Kraus, on the other hand, recalled the discussion of marking the trees but did not believe Fong gave Pacific Coast authorization to cut the trees. Fong, likewise, indicated that he did not authorize tree removal at the meeting.

Edwards presented a draft of the written contract (with all blanks filled in) at the meeting and encouraged the parties to review it with their attorneys. Fong had not decided whether he or one of his companies would be designated as the owner in the contract and specifically wanted to consult with his lawyer on that issue. Espedal and Edwards both testified that it is not unusual to begin work on a construction project before a written contract is signed.

Confident that it had a contract with Fong, despite the lack of a written contract, Pacific Coast subcontracted the tree removal and site preparation to Ken Hood. However, several days later, Komp told Fong by telephone that Pacific Coast would not proceed without a written contract. Fong responded that he was fine with that, because he had not yet obtained the permits or consulted his attorney about the written contract. Nevertheless, the next day he went to the site as agreed and confirmed that the correct trees had been identified for cutting.

---

[1] Both Komp and Espedal testified that it is more typical for a bid to be approved a week after the bids are opened and that the month delay between the opening of bids and approval of Pacific Coast's bid was quite unusual. A construction expert likewise testified that time is of the essence in assuring that the price quotes relied on by contractors in making their bids remain reliable.

Komp followed up with another phone call and a fax stating that the tree clearing was scheduled to begin on September 19, adding, "I need to have a signed contract before I proceed with this clearing. Please contact me on [September 18] to see if we can schedule a meeting to sign the contracts." Fong responded again in the phone conversation that he had not as yet been able to contact his lawyer. He testified that he told Pacific Coast to stop all work, but, according to Komp, Fong did not instruct Pacific Coast to hold off on the tree removal. The parties agree, at least, that Fong did not tell Pacific Coast that it was not bound by the provision in the bid package that required it to begin work within 10 days after the project was awarded. At Pacific Coast's direction, Ken Hood proceeded as scheduled on September 19 to clear the brush and trees. It also performed erosion control, hauled off debris, rough graded and grubbed the site,[2] and installed a construction entrance. An ODOT permits specialist testified that a preconstruction meeting—which had not occurred—was in fact required before installation of construction access.

The parties met again in late September because Pacific Coast had concerns about Fong's financial viability. Also in late September, Fong's attorney suggested to him a number of changes to the bid documents (which had been taken from standard AIA documents). Fong then conveyed those proposed changes to Espedal. Until this project, Espedal had never had an owner request a change to contract documents after bids were opened. Espedal told Fong he would have to get back to him on the proposed changes, some of which would have involved additional cost.

At a meeting on October 2, Komp informed Fong that, given the time delays, there now would likely be additional costs associated with winterizing the site to continue with construction unless the work was postponed until spring. He also reported that the trees had been removed

---

[2] As a Ken Hood employee explained,

"[g]rubbing is after you've cleared, you strip the upper topsoil until you get to a mineral soil, subsoil, which is where you could start a structural or engineer field on it if you built on any of that, and in that area is the stumps and the roots from the stumps."

from the property. Fong reacted with surprise, but the parties otherwise disagree on his response. Fong testified that he instructed Pacific Coast to "hold everything" and let him do "damage control," meaning that he would hurry up and get the permits and "hopefully the agency won't notice we did it without a permit." Komp, on the other hand, testified that Fong "in no way" instructed them to stop work: "When we explained we didn't need the permit to do any of that, it was okay." In any event, it is undisputed that Fong did not post a notice of nonresponsibility pursuant to ORS 87.030, though the parties dispute the significance of that fact.[3] He did, however, ask Pacific Coast to sign an $11,000 bond in favor of a sewage agency and a contract with that agency, which obligated Pacific Coast to complete the required storm and sewer work. In the meantime, Komp instructed Ken Hood to stop work on the site because Pacific Coast had no written contract with Fong.

Fong succeeded in obtaining the permits two days later. A week after that, Komp sent him a letter outlining the winterization costs and also expressing continuing concern about the parties' failure to sign a written contract: "While I continue to be hopeful we can resolve these issues," Komp wrote, "we still do not have a contract and we are unable to pro[ceed] any further until these issues are resolved."[4] When Fong called Espedal the following week to inform him that he wanted to wait until spring to proceed rather than incur the additional winterization costs, Espedal informed him that costs would go up from the original bid in that event as well. Additional discussions about the increased costs proposed by

---

[3] ORS 87.030 provides:

"Every improvement * * * constructed upon lands with the knowledge of the owner shall be deemed constructed at the instance of the owner, and the interest owned shall be subject to any lien perfected pursuant to the provisions of [the construction lien law], unless the owner shall, within three days after the owner obtains knowledge of the construction, give notice that the owner will not be responsible for the same by posting a notice in writing to that effect in some conspicuous place upon the land or the improvement situated thereon."

[4] Komp explained at trial that, although the letter referred to the absence of a contract, he was referring to a *written* contract. He also explained that, although he believed that the parties already had a contract, he wanted a written contract for a variety of business reasons before beginning substantial work on the project.

Pacific Coast eventually broke down, and Fong decided not to proceed with the project.

When Ken Hood billed Pacific Coast for its work on the project, Pacific Coast refused to pay, asserting that Ken Hood's work clearing, grubbing, and rough grading the site was not authorized. Ken Hood filed a lien, and Pacific Coast in turn filed a lien on Fong's property on December 28, 2000. The bulk of the work on the project had stopped sometime in early October; however, on October 16, a dump truck driver who worked for Ken Hood or a related company worked for seven and one-half hours hauling debris from the site. The truck had been loaded earlier but had been left on the site— together with some other of Ken Hood's equipment—because rainy weather precluded its removal. Ken Hood removed the rest of its equipment in early November. Pacific Coast filed a second lien addressing the same work on January 29, 2001.

According to Komp, the removal of the trees from the property and the other work done benefitted Fong in the amount of Pacific Coast's later lien claim. Under the contract documents in the bid package, Ken Hood was entitled to the trees that were removed. It chipped and disposed of those trees, and the firewood was given away. The timber had no merchantable value, according to the Ken Hood project manager. However, Fong's expert testified that the net "logging value" of the removed trees was about $1,300; their net firewood value was about $4,500; and the "landscape replacement value" of the removed trees was $187,400.

■　　We begin with Pacific Coast's assignment of error on cross-appeal regarding its contract claim. In its complaint, Pacific Coast alleged that it had a contract with Fong to build the restaurant and that Fong had breached the contract. The trial court concluded, however, that the parties never formed a contract:

> "[Pacific Coast] argues that a contract was created when the bid was accepted. This argument fails because, beginning virtually immediately after acceptance of the bid, [Pacific Coast] insisted that there was no contract until the parties signed a contract; specifically, [Pacific Coast] informed Fong that [it] would not proceed with clearing until it had a signed contract. * * * [Pacific Coast] insisted

that there was no contract and insisted that it and Fong act as if there was no contract and Fong did so act.

"To some extent, both sides are guilty of talking out of both sides of their mouths on this issue; [Pacific Coast] for saying then that there was no contract and that it would not perform work without a contract, yet performing work anyway and Fong for stalling on the signing of a contract in order to keep [Pacific Coast] on a string while he contacted other contractors and tried to get his financing in order."

On appeal, Pacific Coast assigns error to that ruling, contending that "the contract documents provided that the low bid selected by the owner would be accepted by a notice of award and Fong unequivocally awarded the contract to Pacific Coast" in the award letter. According to Pacific Coast, "virtually all of the terms and conditions of the contract were known prior to the time that Pacific Coast submitted its bid for the project." An enforceable contract was created at the time that Fong awarded the contract, Pacific Coast concludes, "even though the parties intended to enter into a written contract at a later date."

Fong responds that the evidence at trial was disputed and that the trial court resolved that dispute by finding that no contract was formed. According to Fong, this court is bound by that "finding" unless there is no evidence to support it. Fong takes the position that, although the parties were negotiating a contract, they never formed a contract. Moreover, he asserts, the acceptance letter contained a new term—a request for a performance bond—that was not part of the bid documents. It follows, Fong argues, that the award letter could not have constituted contract acceptance.

■■ We begin with our standard of review. Whether a contract existed is a question of law. *Key West Retaining Systems, Inc. v. Holm II, Inc.*, 185 Or App 182, 188, 59 P3d 1280 (2002), *rev den*, 335 Or 402 (2003); *see Wagner v. Ranier Mfg. Co.*, 230 Or 531, 537, 371 P2d 74 (1962) ("[T]he rule in this state is that where the evidence of the alleged contract is all contained in letters or other writings, it is the province of the court to construe them and see if they constitute a contract."). Because the issue of contract formation is a question of law, we owe no deference to the trial court's conclusion, nor

are we bound by what Fong characterizes as a "finding" that no contract was formed. Here, viewing the evidence in the light most favorable to Fong and considering whether any evidence exists to support the trial court's conclusion, *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 490, 982 P2d 1117 (1999), we conclude that a contract was formed as a matter of law.

■ ■    Oregon subscribes to the objective theory of contracts. *Kabil Developments Corp. v. Mignot*, 279 Or 151, 156, 566 P2d 505 (1977). In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts. *Id.* at 157-58. Contract formation requires "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Restatement (Second) of Contracts* § 17(1) (1981). "The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." *Id.* at § 22(1).

■    The parties do not dispute that Pacific Coast's submittal of a bid for the project constituted an offer.[5] The issue is whether Fong accepted the offer. " 'A manifestation of acceptance to the offeror or his agent forms the contract regardless of the intent of the acceptor.' " *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 355, 709 P2d 727 (1985) (quoting *Restatement* at § 20 and citing *Sheedy v. Stall*, 255 Or 594, 600, 468 P2d 529 (1970)). Here, as noted, Fong responded to Pacific Coast's offer with the award letter, containing the following language:

> "It is my pleasure to inform you that your company has been chosen over tough competition to build the restaurant.

---

[5] In the context of contracts for public improvement, an administrative rule makes the point explicitly:

"(1) **Offer and Acceptance.** The Bid or Proposal is the Bidder's or Proposer's offer to enter into a Contract.

"(a) In competitive Bidding, the Offer is always a 'Firm Offer,' *i.e.*, the Offer shall be held open by the Offeror for the Contracting Agency's acceptance for the period specified in OAR 137-049-0410. The Contracting Agency's Award of the Contract to a Bidder constitutes acceptance of the Offer and binds the Offeror to the Contract."

OAR 137-049-0280.

It is my intention to sign a contract with you *based on our verbal agreement* that the price of the project is increased to $1,259,888.00 which reflects your obligation to provide a performance bond and payment bond on the project."

(Emphasis added.) Viewed objectively, the award letter manifests an acceptance of Pacific Coast's offer to build the restaurant and to obtain a performance bond in return for Fong's payment of $1,259,888.00.[6] "Anything that amounts to a manifestation of a formed determination to accept the offer, communicated to the party making such offer" completes the contract. *Gordon v. Curtis Bros. et al.*, 119 Or 55, 62-63, 248 P 158 (1926). Here, Fong's letter, even without more, operated as an acceptance of Pacific Coast's offer.

■ But in this case, there was more. Mutual assent may be inferred from the conduct of the parties. *Vtech Communications, Inc. v. Robert Half, Inc.*, 190 Or App 81, 86, 77 P3d 1154 (2003), *rev dismissed*, 337 Or 547 (2004). Here, both parties acted as if they had a contract, notwithstanding that a written contract had not been executed. Pacific Coast's conduct in subcontracting work and making other commitments and preparations is an objective indication that an agreement existed. Fong's statement that he had intended to enter into a written contract with Pacific Coast based on the contract documents that were put out to bid, his conduct in procuring permits and verifying the trees that were to be removed, and his continued discussions about the progress of the project manifested his assent to the agreement.

The fact that the parties anticipated reducing their agreement to writing but never actually did does not change the analysis. *See Restatement* at § 27 ("Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof[.]"). Indeed, the bid form itself required the contractor to whom an award was made to agree

---

[6] Contrary to Fong's assertion that, because of the reference to a performance bond, the award letter was a counteroffer, the record makes clear that the addition of the performance bond requirement took place before the letter was written. By that time, negotiation about the performance bond had already taken place and, as the award letter indicates, the parties had agreed that Pacific Coast would obtain such a bond.

to commence construction within 10 days, regardless of whether a written contract was executed:

> "Notwithstanding any delay in the preparation and execution of a formal Contract Agreement, the undersigned [Pacific Coast] agrees to commence work on the project within ten (10) days following receipt of written notice of acceptance of bid from [Fong]."

Certainly Pacific Coast, and perhaps Fong, anticipated that their agreement would be reduced to a formal, written contract. But as of the date of the award letter—and based on the parties' conduct in the weeks thereafter—mutual assent to the terms set forth in the bid package had already occurred.

■   Even if the parties intended to iron out the details before signing the formal contract, that did not negate the contract formation that occurred with the award letter. "[P]arties who agree on the essential terms of a contract may intend those terms to be binding and, at the same time, implicitly agree to bargain in good faith on the remaining terms. That fact does not prevent a court from enforcing the parties' agreement." *Hughes v. Misar*, 189 Or App 258, 266, 76 P3d 111 (2003), *rev den*, 336 Or 615 (2004). Fong has not pointed to any *essential* term of the contract that remained to be negotiated after issuance of the award letter.

■   Finally, the foregoing analysis is not affected by the later discussions regarding changes to the contract terms suggested by Fong's lawyer. Because the parties already had agreed to the essential terms of the agreement, those discussions are more accurately characterized as proposed modifications to the contract. *See Restatement* at § 27 comment d ("Even though a binding contract is made before a contemplated written memorial is prepared and adopted, the subsequent written document may make a binding modification of the terms previously agreed to."). The trial court erred in concluding that the parties did not have a contract.[7]

---

[7] In this case, Pacific Coast sought the same damages under two different, mutually exclusive, theories: *quantum meruit* and breach of contract. Because we conclude that the parties had a contract, we do not address Fong's first assignment of error, in which he challenges the trial court's judgment in favor of Pacific Coast on its *quantum meruit* claim. *See Kashmir v. Patterson*, 43 Or App 45, 47-48, 602 P2d 294 (1979), *aff'd*, 289 Or 589, 616 P2d 468 (1980) ("*Quantum meruit* is a form of restitution where the plaintiff has performed services for defendant and seeks to

■    We turn to Fong's timber trespass claim. On that claim, the trial court ruled that Fong "recovers nothing," reasoning that "[t]he tree cutting did not damage him[;] it benefitted him." In his second assignment of error, Fong challenges that ruling, asserting that the "trial court erred in entering judgment in favor of Pacific [Coast] and against Fong * * * based on the conclusion that the tree removal benefitted rather than damaged Fong." Fong asserts that "the trial court impermissibly focused on whether Fong had benefitted from the work * * *." "The trial court's conclusion that Fong recovers nothing on the claim because the tree cutting benefitted him," Fong claims, "is absolutely contrary to Oregon's statutory scheme." Pacific Coast responds that the claim of error is not preserved and that, in all events, the trial court's finding that removal of the timber benefitted Fong is supported by the record. At oral argument, Fong's counsel conceded that the claim of error was not preserved, but argued that this court should address it as plain error.

■    This court will not reach a claim of error that has not been preserved below unless it is an error of law apparent on the face of the record, that is, plain error. ORAP 5.45(1); *see Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991) (explaining plain error doctrine). This court recently summarized the criteria that we examine in determining whether a lower tribunal has committed plain error:

> "To be plain error, the error must satisfy three criteria: (1) it must be an error 'of law'; (2) it must be 'apparent,' meaning the point of law must be obvious, that is, not reasonably in dispute; and (3) it must appear on the face of the record, meaning the court need not look beyond the record to identify the error or 'choose between competing inferences, and the facts constituting the error must be irrefutable.' "

*State v. Thackaberry*, 194 Or App 511, 513-14, 95 P3d 1142 (2004), *rev den*, 338 Or 17 (2005) (quoting *Ailes*, 312 Or at 381-82). In determining whether the trial court committed plain error in this case, we begin by examining the timber trespass statute.

---

recover their fair value. The law, in appropriate situations, will imply a quasi-contract. It is not consensual. It is not a contract. It is a remedial device which the law affords to accomplish justice and prevent unjust enrichment.").

ORS 105.810(1) provides, in part:

"[W]henever any person, without lawful authority, willfully injures or severs from the land of another any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub on the land of another person, * * * in an action by such person * * * against the person committing such trespasses if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed for the trespass."

The question is whether the trial court committed plain error in rejecting Fong's timber trespass claim on the ground that the timber removal benefitted, rather than damaged, the property.

██      The ordinary measure of damages in a timber tres-
pass case is the difference between the market value of the owner's property before the trespass and its value after the trespass. *United States v. Firchau*, 234 Or 241, 248, 380 P2d 800 (1963); *Sinsel v. Henderson*, 62 Or App 150, 153, 660 P2d 1072 (1983). Here, Komp testified—without contradiction—that the removal of the timber increased the value of Fong's property.[8] The question is whether the trial court committed plain error in concluding, based on that testimony, that Fong could not prevail. At least one case suggests that it did not.

In *Hampton v. Portland Gen. Elec.*, 268 Or 121, 122, 519 P2d 89 (1974), the defendant cut down some trees that were "rotten or broken off as a result of wind or snow." The plaintiffs sought treble damages under the timber trespass statute. "The jury was instructed that the measure of damages was the difference between the market value of plaintiffs' property before and after the trespass," and it returned a verdict for the defendant. *Id* at 124. The Supreme Court affirmed, explaining:

"There was evidence which, if believed would establish that the trees cut by defendant were so badly damaged by storm or disease that their removal could not have resulted in the diminution of plaintiffs' land. We can assume that the jury

---

[8] Fong introduced testimony that the trees removed had some value, but not that the removal of the trees decreased the value of the property. The trial court was entitled to disbelieve Fong's testimony and to believe Komp's testimony.

accepted this view of the case in awarding no damages to plaintiffs."

*Id.* That is, the court held that a plaintiff cannot prevail on a timber trespass claim in the absence of proof that the trespass decreased the value of the land. In light of the holding in *Hampton*, it was not plain error for the trial court in this case to reject Fong's timber trespass claim on the ground that he suffered no damages.

██        We turn next to Pacific Coast's lien foreclosure claim. As noted, Pacific Coast filed two construction liens addressing the same work, and it sought to foreclose on those liens as part of this litigation. In ruling against Pacific Coast on that claim, the trial court explained its reasoning as follows:

"Work was last performed during the first week of October. Although a truck was driven off the lot on October 16th, this was only because it had been left overnight during the first week of October and bad weather had prevented its removal in the interim. This does not constitute work on the project.

"The first lien was filed on December 28, 2000, more than 75 days after work was last performed. Thus, that lien was ineffective.

"The second lien was filed on January 29, 2001. This was within 75 days of the termination of the project. However, the statute requires a lien to be filed on the earlier of 75 days after last performing work on the project or 75 days after termination of the project. So, [Pacific Coast's] failure to meet the earlier deadline is determinative.

"[Pacific Coast's] lien claims fail. Fong is entitled to attorney fees on the lien claims."

On appeal, Pacific Coast assigns error to the trial court's rejection of its lien foreclosure claim, asserting that, although there is no controversy about the underlying facts, the trial court erred in applying the law to the undisputed facts. We agree.

██        ORS 87.010(1) provides:

"Any person performing labor upon, transporting or furnishing any material to be used in, or renting equipment used in the construction of any improvement shall have a

lien upon the improvement for the labor, transportation or material furnished or equipment rented at the instance of the owner of the improvement or the construction agent of the owner."

A person who has a construction lien "shall perfect the lien not later than 75 days after the person has ceased to provide labor, rent equipment or furnish materials or 75 days after completion of construction, whichever is earlier." ORS 87.035(1). " 'Completion of construction' occurs when, *inter alia*, the 'improvement is substantially complete.' ORS 87.045(1)(a)." *Westwood Construction Co. v. Hallmark Inns*, 182 Or App 624, 628 n 4, 50 P3d 238, *rev den*, 335 Or 42 (2002). The issue here is whether Pacific Coast filed its lien foreclosure claim within 75 days after the earlier of (1) the date it ceased to provide labor or (2) the date on which construction was substantially complete. We review *de novo* whether Pacific Coast timely filed its lien foreclosure claim. *Miller v. Ogden*, 325 Or 248, 250, 935 P2d 1205 (1997); *Bend Tarp and Liner, Inc. v. Bundy*, 154 Or App 372, 377, 961 P2d 857, *rev den*, 327 Or 484 (1998).

We agree with Pacific Coast that the material underlying facts are undisputed. As noted, the trial court—based on the undisputed evidence of what occurred on October 16— found that "[w]ork was last performed during the first week of October," because driving the dump truck off the property on October 16 "does not constitute work on the project." That is, the trial court focused on the "ceased to provide labor" portion of ORS 87.035(1) and found that Pacific Coast ceased to provide labor before October 16, more than 75 days before the first lien was filed. We disagree with the trial court's finding. Although it had finished much of the work earlier in the month, Pacific Coast—through its subcontractor, Ken Hood—did not "cease to provide labor" within the meaning of the lien statute until October 16. Indeed, the driving of a dump truck filled with construction debris to a disposal site, where the debris is off-loaded, can hardly be characterized as anything but labor. That work, which took seven and one-half hours to complete, benefitted Fong and was included in the scope of the contract. Accordingly, Pacific Coast's first lien was filed within 75 days of October 16, the date it ceased to provide labor.

■      The remaining question is whether construction was substantially complete before October 16; if it was, the lien was not timely filed, because ORS 87.035(1) requires that the lien be perfected no more than 75 days after the person "ceased to provide labor or after completion of construction; *whichever is earlier*." (Emphasis added.) Pacific Coast argues that construction was not substantially complete as of October 16. "Indeed," it asserts, "only approximately $50,000 of the $1,259,888 project had been completed as of that time." In addition, a bill sent by Pacific Coast to Fong in December 2000 indicated that the project was less than five percent complete even then. Fong responds that construction was substantially complete before October 16 because Pacific Coast (through Ken Hood, its subcontractor) performed only the insubstantial task of removing its equipment and removing debris after early October. *See, e.g., Pro Excavating, Inc. v. Ziebart*, 148 Or App 436, 441, 939 P2d 1187 (1997) ("A contractor does not extend the time to file a lien by returning to a job to perform 'some trifling work or a few odds and ends' after apparently completing the job and removing its equipment.") (quoting *Christenson v. Behrens*, 231 Or 458, 467, 372 P2d 494 (1962)).

We agree with Pacific Coast. Although the last work on the project before it was prematurely terminated was relatively minor, "construction" was nowhere near substantially complete before October 16. The cases cited by Fong involved construction projects that were essentially complete, but where a contractor had returned to perform minor work. In contrast, on the record before us in this case, the construction on the restaurant never became "substantially complete," because the project was terminated. It follows that the earlier of the two dates from which the 75-day period began to run was the date on which Pacific Coast ceased to provide labor, October 16. Because Pacific Coast filed its lien within 75 days after that date—on December 28—it was timely filed.[9]

We turn finally to Fong's assignments of error regarding attorney fees. In his third assignment of error, he

---

[9] Pacific Coast presented alternative arguments to support its contention that it timely filed its lien. Because, as explained in the text, we agree with its first argument, we do not address its alternative arguments.

argues that the trial court erred in awarding attorney fees to Pacific Coast as the prevailing party on the timber trespass claim. We affirm that award without further discussion. In his fourth assignment of error, Fong claims that the trial court "abused its discretion in limiting the award of attorney fees to Fong to 25 percent of the amount requested, when Fong was the prevailing party on plaintiff's claims for lien foreclosure, breach of contract and account stated." Because we reverse on the breach of contract and lien foreclosure claims—no attorney fees were awarded on the account stated claim—we also reverse the award of attorney fees to Fong on those claims. *See* ORS 20.220(3)(a) ("If the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed[.]").

Affirmed on appeal; reversed on cross-appeal; award of attorney fees to Fong reversed.