Argued and submitted December 14, 2005, affirmed December 6, 2006

McDOWELL WELDING & PIPEFITTING, INC.,
an Oregon corporation,
*Appellant,*

*v.*

UNITED STATES GYPSUM COMPANY,
a Delaware corporation;
Port of St. Helens,
an Oregon municipal corporation;
BE&K Construction Co., Inc.,
an Alabama corporation,
*Respondents,*

*and*

EC COMPANY,
dba Electrical Construction Co.,
*Defendant.*

UNITED STATES GYPSUM COMPANY,
a Delaware corporation;
BE&K Construction, Co., Inc.,
an Alabama corporation,
and Port of St. Helens,
an Oregon municipal corporation,
*Respondents,*

*v.*

McDOWELL WELDING & PIPEFITTING, INC.,
an Oregon corporation,
*Appellant.*

01-2126; A125459

149 P3d 173

Bruce H. Cahn argued the cause for appellant. With him on the opening brief was Ball Janik LLP. With them on the reply brief was James T. McDermott.

Daniel K. Reising argued the cause for respondents United States Gypsum Company and BE&K Construction Co., Inc. With him on the brief were Charles F. Adams and Stoel Rives LLP.

No appearance for respondent Port of St. Helens.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

HASELTON, P. J.

Armstrong, J., dissenting.

_____

* Rosenblum, J., *vice* Ceniceros, S. J.

**HASELTON, P. J.**

Plaintiff McDowell Welding & Pipefitting, Inc., appeals a judgment in favor of defendants BE&K Construction Co., Inc. (BE&K) and United States Gypsum Company on (1) plaintiff's claims including claims of breach of contract and construction lien foreclosure and (2) defendants' counterclaim for declaratory judgment and specific performance of a settlement agreement. Plaintiff's assignments of error pertain to four basic issues: Whether plaintiff was entitled to a jury trial on defendants' counterclaim; whether the trial court properly construed particular contractual provisions; whether the trial court should have awarded prejudgment interest on the settlement amount; and whether the trial court lacked jurisdiction to enter summary judgment on plaintiff's claim after it had ruled on the counterclaim. We write only to address plaintiff's first argument, and reject the remainder of plaintiff's arguments without discussion. As explained below, we conclude that the majority of plaintiff's arguments concerning entitlement to a jury trial are not properly before us, given the nature of plaintiff's assignment of error concerning jury trial rights. Accordingly, we affirm the trial court's judgment.

A brief explanation of the procedural posture of the case is necessary in order to explain our conclusion. Defendant United States Gypsum Company contracted with BE&K to build a wallboard factory in Rainier. Defendant BE&K, in turn, subcontracted with plaintiff to install pipes, instruments, and other factory components. After plaintiff had completed its work, a dispute arose concerning the amount that it was entitled to be paid.

In April 2001, plaintiff initiated this action, alleging a variety of breach of contract and related claims, seeking damages of approximately $2 million, and also seeking foreclosure of a construction lien. In their answer, defendants asserted a defense that the parties had agreed to settle the dispute for $800,000, and defendants also alleged a counterclaim for a declaratory judgment concerning, and specific enforcement of, the alleged settlement. Defendants moved,

pursuant to ORCP 53 B,[1] to have the court try the counter-claim concerning the settlement agreement separately from plaintiff's claims. Although plaintiff opposed bifurcation, the trial court granted that motion.

Plaintiff then requested a jury for "the separate trial on [the] counterclaim relating to the alleged settlement agreement between the parties." Defendants objected on the ground that the counterclaim seeking performance of the settlement agreement was equitable in nature and that there is no jury entitlement in equitable proceedings.

The trial court agreed with defendants and held a bench trial on the counterclaim. The central and dispositive issue on the counterclaim was whether plaintiff had, in fact, orally agreed to the alleged settlement. The court resolved that factual question in defendants' favor. Accordingly, the trial court entered a limited judgment on the counterclaim, ordering specific performance of the settlement agreement.

Shortly thereafter, defendants moved for summary judgment on plaintiff's claims, arguing that the settlement agreement released all of plaintiff's claims and that no genuine issue of material fact remained to be decided. Plaintiff opposed the motion, arguing (1) that the trial court lacked jurisdiction to consider the motion because plaintiff had, in the interim, filed a notice of appeal from the limited judgment and (2) that the settlement agreement did not release all of plaintiff's claims. The trial court granted defendants' motion for summary judgment and entered a general judgment in defendants' favor. Plaintiff then appealed the general judgment as part of the present appeal, as well.

As noted, plaintiff attempts to raise numerous issues on appeal, including the potentially provocative question of whether, or when, a plaintiff asserting a legal claim and

---

[1] ORCP 53 B provides:

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or issues, always preserving inviolate the right of trial by jury as declared by the Oregon Constitution or as given by statute."

defending against a related equitable counterclaim is entitled to a jury trial. *See generally* 209 Or App at 448 (Armstrong, J., dissenting). Whatever their abstract merit, however, we are procedurally precluded from addressing the substance of most of those challenges. Bluntly: With one exception addressed below, plaintiff's jury-trial-related challenges are not reviewable within the context of its assignments of error.

Three key rulings occurred in this case that relate to the jury trial issue: (1) The trial court granted defendants' motion to try the equitable counterclaim separately from, and prior to, plaintiff's claim. (2) The trial court denied plaintiff's motion for a jury trial on the equitable counterclaim and decided that counterclaim in defendants' favor. (3) The trial court entered summary judgment in defendants' favor on plaintiff's claims on the ground that the settlement (the subject of the equitable counterclaim) had released plaintiff's claims.

On appeal, plaintiff assigns error only to the second of those rulings. That is, plaintiff does *not* argue that, because the facts of the legal claims and equitable counterclaim are interrelated, it was entitled to have its claims and the counterclaim tried together to a jury. Nor does plaintiff argue that the trial court erred in entering summary judgment on plaintiff's claims based on the court's disposition of the counterclaim.[2] Rather, plaintiff has assigned error merely to the court's denial of its request for a jury trial on defendant's bifurcated equitable counterclaim.

Given that procedural posture, the "big picture" questions raised and resolved by the dissent simply are not in play.[3] Again, the *sole* question presented by plaintiff's assignment of error is whether plaintiff was entitled to a jury trial on defendants' separately tried counterclaim for specific enforcement of a settlement agreement. The answer to that

---

[2] Although, as noted, plaintiff does assign error to the trial court's summary judgment on its claims, it argues only that the trial court *lacked jurisdiction* to rule on the summary judgment motion because of the pendency of the appeal from the limited judgment. We reject that argument without discussion.

[3] Indeed, the dissent advances an analysis that is completely, qualitatively different from that presented and joined in the parties' briefs.

question is uncomplicated: *First,* a claim for specific enforcement of a settlement agreement is an equitable claim. *Hughes v. Misar,* 189 Or App 258, 260 n 2, 76 P3d 111 (2003), *rev den,* 336 Or 615 (2004). *Second,* there is no right to a jury trial in an equitable proceeding for specific performance of a contract. *See generally Phillips v. Johnson,* 266 Or 544, 549, 514 P2d 1337 (1973). Thus, given the scope of the assignment of error, we conclude that the trial court did not err in denying plaintiff's motion for a jury trial on the separately tried equitable counterclaim.

With that said, we emphasize what we are *not* deciding in this case. We are not deciding whether the legal claims and equitable counterclaim should have been tried together to a jury in light of the common factual issues. Nor are we deciding whether, or to what extent, a trial court's antecedent resolution of disputed issues of fact in adjudicating an equitable counterclaim should be given preclusive effect with respect to the later resolution of legal claims in the same litigation. *But see Safeport, Inc. v. Equipment Roundup & Mfg.,* 184 Or App 690, 708-14, 60 P3d 1076 (2002) (court erred in dismissing plaintiff's breach of contract claim based on its earlier resolution of related lien foreclosure counterclaim).

The intersection of legal and equitable claims and counterclaims involving common disputes of fact in the same proceeding is complex and difficult. As we noted in *Safeport*:

"The dilemma involves how to resolve inconsistencies between the decisions of equally competent finders of fact with respect to the same issue in a single action. For example, suppose that a trial court decides that a lien claimant did not breach the parties' contract and awards the full amount sought. Then suppose that a jury determines that the claimant *did* breach the contract and awards damages to the other party on a counterclaim. Do the recoveries offset? If not, is the claimant entitled to proceed with a foreclosure sale even though it owes a net award to the opposing party? Put another way, if law of the case and preclusion principles are inapplicable, what principles determine the ultimate relief to which each party is entitled? Does the jury's decision override the court's opposing findings?

Unsatisfying as it may seem, we can only speculate concerning those matters at this stage, because no jury determination of the breach of contract claim has yet been made in this case."

184 Or App at 713 n 3 (emphasis in original). Just as those interesting issues were beyond our reach in *Safeport*, they are beyond our proper purview in this case.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority concludes that the trial court did not err in denying plaintiff a jury trial on defendants' counterclaim for specific performance of the parties' purported settlement agreement. It reasons that plaintiff had to assign error to a ruling other than the trial court's ruling that denied plaintiff a jury trial on defendants' counterclaim. The majority is wrong. As I will explain, plaintiff was entitled to a jury trial on the factual issue that was common to plaintiff's claim and defendants' counterclaim, which is whether the parties had entered into a settlement agreement.

Article I, section 17, of the Oregon Constitution provides that "[i]n all civil cases the right of Trial by Jury shall remain inviolate." The Supreme Court has explained

"that Article I, section 17, guarantees a jury trial 'in those classes of cases in which the right was customary at the time the [Oregon] constitution was adopted or in cases of like nature.' "

*Lakin v. Senco Products, Inc.*, 329 Or 62, 69, 987 P2d 463 (1999) (quoting *Molodyh v. Truck Insurance Exchange*, 304 Or 290, 295, 744 P2d 992 (1987)); *see also Tribou v. Strowbridge*, 7 Or 156, 158 (1879) ("Th[e] language of the constitution indicates that the right of trial by jury shall continue to all suitors in courts in all cases in which it was secured to them by the laws and practice of the courts at the time of the adoption of the constitution."). In other words, "whatever the right to 'Trial by Jury' meant in 1857, it means precisely the same thing today." *Lakin*, 329 Or at 72. Thus, the issue here is whether plaintiff would have had a right to a jury trial in 1857 on the fact question of the existence and terms of the purported February 22 settlement agreement.

It is, of course, hornbook law that there is a right to a jury trial on most legal claims and defenses, but no such right, generally, on equitable claims and defenses. Or Const, Art VII (Amended), § 3; *Phillips v. Johnson*, 266 Or 544, 549, 514 P2d 1337 (1973). In their arguments on appeal, the parties focus primarily on whether defendants' counterclaim for declaratory relief and specific performance of the purported settlement agreement was legal or equitable. But, even if we were to assume that defendants' counterclaim was equitable in nature, resolving that question does not tell us whether the trial court erred in denying plaintiff's request for a jury trial. We must also examine whether, as plaintiff argued to the trial court, "defendants are attempting to do an end run around [plaintiff]'s constitutional right to a jury trial on its breach of contract" claim.

The resolution of that question presents two complex issues. The first issue arises from the joinder of plaintiff's apparently legal claims with defendants' apparently equitable counterclaim. The second issue stems from the dichotomy between two historical classes of settlement agreements, one equitable and one legal. As this opinion works through those issues, it will become clear that we are peeling an onion, for each layer leads to another layer. But, despite this opinion's baroque qualities, it is nonetheless the analysis demanded by the Supreme Court's historical interpretation of the jury trial right under the Oregon Constitution.

I start with the question of how this case would have proceeded in 1857. Due to the paucity of case law on this matter, my analysis relies heavily on inferences from statements in post-statehood case law and statutes.

In 1866, the legislature amended the Deady Code of Civil Procedure to provide that

"[w]hen the facts stated in the pleadings present a case cognizable in a court of law, the case shall proceed as an action at law. But if the facts stated, either by the plaintiff or defendant, show a case requiring the interposition of a court of equity, the case shall proceed as a suit in equity."

Oregon Laws 1866, 4th Regular Session (1866), An Act to Amend an Act Entitled "An Act to Provide a Code of Civil Procedure" § 1, p 12. In *Delay v. Chapman*, 2 Or 242, 244-45 (1867), the reporter noted that that provision marked a "radical change in the practice [of law]," and the Supreme Court explained that, without the 1866 amendment,

> "a defendant in ejectment, who had the equitable title, in order to avail himself of it, would have to resort to his suit in equity, and seek to enjoin the plaintiff from proceeding with his action at law until the equitable suit of the defendant could be determined. This statute is intended to allow him to interpose his equitable title by answer. Though this amendment to [the Deady Code] virtually unites actions at law, and suits in the same case, it does not violate [the Oregon Constitution]."

*See also Zeuske v. Zeuske*, 55 Or 65, 69, 103 P 648 (1909) (contrasting the 1866 amendment and a subsequent amendment in 1870 with the historical practice).

From those cases and that early statute, I infer that, had plaintiff brought an action at law against defendants for breach of contract in 1857, and defendants wished to assert the purported settlement agreement as a defense and seek its enforcement, then defendants would have had to bring a suit in equity, as plaintiffs, to do so. That is, in 1857, defendants could not assert their equitable defenses or counterclaim in plaintiff's legal action, and instead would have had to resort to equity. The equity court would then enjoin plaintiff in the legal action from prosecuting its claims until it had resolved the equitable counterclaim. *See Delay*, 2 Or at 245.

The question then becomes whether plaintiff, as a defendant in defendants' equitable suit, would have a right to a jury trial on the question of the existence and terms of the purported settlement in the chancery court in 1857. One's gut reaction to that question may be "no," based on the oft-repeated claim that "[n]o rule of law imperatively requires the chancellor to take the verdict of the jury upon any question in his court, and the office of such verdict, when taken, is to advise, and not bind his judgment upon the matter in dispute." *Parrish v. Stephens*, 1 Or 73, 74 (Or Terr 1853) (*dictum*). However, the Supreme Court of the United States

and at least two of the federal circuit courts have recognized two related principles embodied in the Seventh Amendment to the United States Constitution that call into question the universality of that statement.

In *Beacon Theatres, Inc. v. Westover*, 359 US 500, 79 S Ct 948, 3 L Ed 2d 988 (1959), the United States Supreme Court held that, under the Seventh Amendment, when a case presents a legal claim and an equitable claim, and there is a common disputed issue of fact in both claims, a party has a right, on request, to a jury trial on the common issue of fact.[1] The Court's holding was motivated, in part, by its concerns that a court's determination of the common factual question in the equitable claim could preclude a party from relitigating that question to a jury in the legal claim under the doctrines of claim or issue preclusion. *Id.* at 504.

The principle embodied in *Beacon Theatres, Inc.*, has never been applied under Article I, section 17, of the Oregon Constitution, and we have rejected its application in one context. In *Westwood Corp. v. Bowen*, 108 Or App 310, 315, 815 P2d 1282 (1991), *rev dismissed*, 312 Or 589 (1992), we noted that, under established Oregon law, the doctrines of claim and issue preclusion do not apply to separate claims within the same lawsuit. (Citing *Office Services Corp. v. CAS Systems, Inc.*, 63 Or App 842, 845, 666 P2d 297, *rev den*, 295 Or 773, 670 P2d 1036 (1983)). *Westwood Corp.* involved a lien foreclosure under ORS 87.060(3) and a counterclaim for breach of contract. On the contract counterclaim, the jury found that the defendant had suffered $903,280 in damages; on the lien foreclosure claim, the court determined that the defendant's damages were only $48,000. On appeal, the defendant argued that, under *Beacon Theatres*, the trial court could not find the amount of damages to be different from the amount found by the jury without violating the defendant's constitutional right to a jury trial. We held that

---

[1] The Court qualified that rule somewhat by stating that a court does have limited discretion to deny a jury trial when a party would suffer irreparable harm by the trial of the common factual question to a jury. *Beacon Theatres*, 359 US at 510-11. However, the Court emphasized "that only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims." *Id.*

the trial court did not err in making its own damages finding because ORS 87.060(3) requires the court to resolve all pleaded issues if it upholds the lien. *Westwood Corp.*, 108 Or App at 317. We explained that "when both are properly presented, lien foreclosure issues and contract issues are triable to different factfinders, and neither's findings bind the other." *Id.*

This case is distinguishable from *Westwood Corp.* That case involved "two factfinders performing constitutionally or statutorily defined responsibilities in connection with the different claims assigned to them for decision." *Id.* at 317-18. *Westwood Corp.* did not present a "situation in which the subject matter of the equitable claim is eliminated by the disposition of the law claims; rather [it] required findings on the same subject in the two separate contexts, both of which could serve as an independent occasion for a remedy." *Id.* at 318.[2]

Although neither claim nor issue preclusion operates on separate claims within the same lawsuit, it is apparent that, after the trial court determined that plaintiff had accepted defendants' February 22 settlement offer, plaintiff was never going to have the opportunity to present the question of the settlement agreement's existence to a jury in his contract claim. For all practical purposes, the trial court's finding on that question forever resolved it. Consequently, *Westwood Corp.* does not necessarily preclude the application of the *Beacon Theatres* rationale in the context of this case, if it is otherwise consistent with the principles embodied in Article I, section 17, of the Oregon Constitution.

The federal circuit courts have recognized that the constitutional principle embodied in *Beacon Theatres*—that where legal and equitable claims with common questions of fact were joined in a single case, the common question of fact

---

[2] That is so notwithstanding the fact that one of the plaintiff's claims sought to foreclose a lien under ORS 87.060. As we explained in *DeWitt-Erickson Const., Inc. v. Moran Const. Co.*, 86 Or App 474, 477, 739 P2d 1071, *rev den*, 304 Or 280 (1987), when a plaintiff simultaneously seeks to foreclose a lien under ORS 87.060 and to assert a breach of contract claim, the plaintiff retains a right to a jury trial on the contract claim.

must be tried to a jury—extends to cases in which the defendant to a legal claim asserts an equitable counterclaim. In *Turner v. Burlington Northern R.R. Co.*, 771 F2d 341 (8th Cir 1985), the plaintiff had brought an action seeking damages for a workplace injury under the Federal Employers' Liability Act. The defendant asserted a counterclaim for the specific performance of a purported settlement contract. The court—relying in part on the Supreme Court's recognition in *Dairy Queen, Inc. v. Wood*, 369 US 469, 478, 82 S Ct 894, 8 L Ed 2d 44 (1962), that the "right to a trial by jury may not be made to depend on the choice of words used in a pleading"— held that the plaintiff's right to a jury trial under the federal statute could not be "denied by [the defendant's] artful couching of defenses to [the plaintiff's] claims in equitable actions such as specific performance." *Turner*, 171 F2d at 344-45 (internal quotation marks omitted).[3] The United States Court of Appeals for the Fourth Circuit came to a similar conclusion in *Millner v. Norfolk & Western R.R. Co.*, 643 F2d 1005, 1010 (4th Cir 1981). Thus, at least two of the federal circuits have recognized a principle embodied in the Seventh Amendment that prevents a defendant from depriving a plaintiff of a jury trial on a legal claim by asserting a counterclaim for specific performance of a settlement agreement.

I acknowledge that the Seventh Amendment does not apply to the states and that the interpretation of Oregon's constitution is not necessarily the same as that of the federal constitution. *Cf. Suess Builders v. City of Beaverton*, 294 Or 254, 259 n 5, 656 P2d 306 (1982) (explaining that, despite the similarities between Article I, section 18, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, the analyses under the Oregon Constitution "are not necessarily identical to those pronounced from time to time by the United States Supreme Court under the Fifth Amendment"). Consequently, *Beacon Theatres* and the Eighth and Fourth circuits' cases are only persuasive authority at best; we are not bound by them. Nonetheless, the texts of the state and federal provisions are similar and the scope

---

[3] That conclusion is consistent with the Oregon Supreme Court's statement in *Molodyh* that "[o]ne party may not unilaterally decide to have someone other than a jury determine the issues and thereby destroy the other's right to a jury trial." 304 Or at 299.

of the protection offered by both provisions is to be measured by historical standards. *Compare* US Const, Amend VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."), *with* Or Const, Art I, § 17 ("In all civil cases the right of Trial by Jury shall remain inviolate."), *and* Or Const, Art VII (Amended), § 3 ("In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."); *compare Dimick v. Schiedt*, 293 US 474, 476, 55 S Ct 296, 79 L Ed 603 (1935) ("In order to ascertain the scope and meaning of the Seventh Amendment, resort must be had to the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791."), *with Lakin*, 329 Or at 72 ("[W]hatever the right to 'Trial by Jury' meant in 1857, it means precisely the same thing today."). Those similarities indicate that principles similar to those acknowledged by *Beacon Theatres* and the Eighth and Fourth circuits to be embodied in the Seventh Amendment may also be embodied in the Oregon Constitution. I turn once again to history to determine whether we should recognize those principles under Article I, section 17, and Article VII (Amended), section 3.

From the time of the Oregon settlers' first efforts toward self-government in 1841, the right to a jury trial has been protected. In the 1841 meetings, prompted by questions of how to handle the estate of a pioneer who had died intestate, the settlers adopted the laws of the state of New York. *Oregon Archives* 6 (Grover ed 1853) (reproducing minutes of February 18, 1841, settlers' meeting). Article VII, section 2, of the New York Constitution of 1821 provided that "[t]he trial by jury, in all cases in which it has been heretofore used, shall remain inviolate forever[.]" The first organic law of the Oregon Territory, adopted July 5, 1843, provided that "[t]he inhabitants of said territory shall always be entitled to the benefits of * * * trial by jury." Act of July 5, 1842, Art II,

*reprinted in Oregon Archives* at 28. Identical language is found in the second organic law of the territory. Organic Law of the Provisional Government of Oregon, Art I, § 2, p 59 (Deady 1845-1864). In 1848, the United States Congress further ensured that the residents of Oregon Territory would enjoy the right to trial by jury by extending the protections of the 1787 Northwest Ordinance to the inhabitants of the territory. An Act to Establish the Territorial Government of Oregon, § 14, *reprinted in* General Laws of Oregon at 66, 75 (Deady 1845-1864); Northwest Ordinance, Art II (1787); *see also Lakin*, 329 Or at 72 (tracing the various prestatehood jury protections). Hence, the fundamental right to a jury trial on a disputed question of fact in a legal proceeding has been protected in Oregon since at least 1841.

How would the protection of that right have interacted with the requirement, prior to 1866, that a defendant in a legal proceeding had to file a complaint as a plaintiff in equity in order to raise an equitable defense or counterclaim? My resolution of that question is informed by a statute that was continually on the books in Oregon, in one form or another, from 1843 until the enactment of the Deady Code in 1862.[4]

The territorial statute in question provided:

> "If there be an issue of fact, which *shall* render the intervention of a jury *necessary*, the court *may* direct an issue for the trial of the same, and the verdict *shall* be entered of record, and *may* be used on the hearing of the cause. In other cases, the court may order a reference, to take and report the proofs and evidence in the cause, or take them in open court in term time or in vacation."

An Act to Regulate Proceedings in Suits in Equity, ch 1, title I, § 30 (1854), in *The Statutes of Oregon Enacted and Continued in Force by the Legislative Assembly* 199 (1855) (emphasis added). The territorial legislature enacted that statute on January 23, 1854.

Because the meaning of the territorial statute is relevant to the construction of the jury trial right under the

---

[4] Under the Oregon Constitution, the territorial laws became the law of the state until amended or repealed by the state legislature. Or Const, Art XVIII, § 7.

Oregon Constitution, *see Tribou*, 7 Or at 158, it is helpful at this point to examine the statute through the lens of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). I start with the text and context of the statute. *Id.* at 610.

Examined in isolation, the text of the statute does not clearly reveal the legislature's intent. The statute is a mix of "mays"—which are typically permissive—and "shalls"—which are typically mandatory. Thus, it is plausible that the territorial statute merely *permitted* an equity court to direct an issue of fact to a jury. However, the statute speaks of a jury being rendered "necessary," which, of course, is typically understood to mean required, compulsory, and inescapable. Thus, it is also plausible that the statute *required* an equity court to empanel a jury, and be bound by its determination, when a fact question renders it necessary.

When might a jury be necessary? In purely equitable proceedings, there can be no doubt that the court was competent to decide factual questions. Nonetheless, the legislature contemplated that there might be instances when, even in an equitable proceeding, a jury is necessary. The most plausible explanation is that the organic laws' command that the right to a jury trial be preserved could render a jury necessary on a factual question when that fact question was also relevant to a legal issue in a legal proceeding that the equity court had enjoined. In no other instance would a jury be "necessary," in light of the chancellor's competence to address factual questions.

The context of a statute includes prior enacted versions of the same statute and prior judicial construction of the same or similar language. *Mabon v. Wilson*, 198 Or App 340, 346, 108 P3d 598 (2005), *aff'd*, 340 Or 385, 133 P3d 899 (2006). There are two relevant prior versions of the statute in question.

The first relevant statute dates back to 1843. In their first organic law, Oregonians adopted the laws of the Iowa territory to serve as their own. Lawrence Harris, *History of the Oregon Code*, 1 Or L Rev 129, 134-37 (1922) (citing Act of July 5, 1843, Art XII). Among the laws of the Iowa territory at that time was this one:

"If there be an issue as to any matter of fact which shall render a jury *necessary*, the courts *may* direct an issue for the trial of the same, and the verdict *may* be entered of record and made use of at the hearing of the cause."

An Act Relative to Proceedings in Chancery, § 29, *reprinted in The Statute Laws of the Territory of Iowa* 130, 133 (1839) (emphasis added).[5] The second relevant prior version of the statute was enacted in the second session of the legislative assembly in 1850 and provided that

"[i]f there be an issue to any matter of fact which *shall* render the intervention of a jury necessary, the court are [*sic*] *hereby authorized* to direct the issue for the trial of the same and verdict *shall* be entered of record, and made use of at the hearing of the cause."

An Act Directing the Mode of Proceeding in Chancery § 33, *reprinted in Statutes of a General Nature Passed by the Legislative Assembly of the Territory of Oregon at the Second Session, Begun and Held at Oregon City, December 2, 1850* 192-93 (1851). Both prior versions of the statute further muddle the issue of the legislature's intent. Each uses a different combination of typically mandatory and permissive language, the only constant being that it applies where a jury is "necessary."

Turning to judicial constructions of the statute, neither Iowa nor Oregon expressly construed their respective versions of the statute. The Indiana Supreme Court, interpreting similar—though not identical—language in its statute concluded that, in a probate case, "the parties were entitled, as a matter of right, to have the issue tried by a jury and that the court had no right to disregard the verdict unless it was set aside." *Clem v. Durham*, 14 Ind 217, 224 (1860).[6]

---

[5] An identical provision is included in the Revised Statutes of Iowa of 1843, so regardless of whether the "Little Blue Book" or the "Big Blue Book" was the law of Oregon, the statute in question was law in Oregon. *See generally* Lawrence Harris, *History of the Oregon Code: The Controversy About the Seat of Government and Blue Books*, 1 Or L Rev 184 (1922), for a discussion of the distinction between the two Blue Books and the ensuing controversy.

[6] The Indiana statute at issue in *Clem* provided:

"SEC. 15. Whenever, in any suit or proceeding pending in a Probate Court in which the parties shall make an issue or issues of fact, or in which, according to the usages and practice of Courts of chancery, it may be proper that an issue

On the other hand, the Supreme Court of the Territory of Oregon, in 1853, stated (in *dictum*) that "[n]o rule of law imperatively requires the chancellor to take the verdict of the jury upon any question in his court, and the office of such verdict, when taken, is to advise, and not bind his judgment upon the matter in dispute." *Parrish*, 1 Or at 74.[7] The court in *Parrish* did not cite or refer to the territorial statute but, as context, it lends support to the interpretation of the statute as permissive, rather than mandatory.

However, I also note that, in 1854 (after *Parrish*), the legislature enacted the last incarnation of the statute, which was materially different from the version on the books when *Parrish* was decided. The 1854 version provided that the court "may" direct an issue for trial, whereas the prior version provided that the court was "hereby authorized" to do so. Furthermore, whereas the language of the prior version seemed to require the court to "make use" of the jury's verdict, the 1854 version provided that the court "may" do so. The territorial legislature may have intended those changes to be significant; it may not have.

Thus, after looking at the text and context, the territorial statute is ambiguous. On one hand, it is plausible that the legislature intended the statute merely to authorize an equity court to empanel an advisory jury. On the other hand, it is plausible that the legislature intended the statute to require an equity court to empanel a jury and follow its verdict when a jury is necessary, *viz.*, when there is a disputed issue of fact relevant to the equitable proceeding that is also relevant to a legal proceeding, on which the defendant in

---

or issues of fact, or a comprehensive note and entry thereof, be made, such Probate Court shall be authorized to order such issue or entry, when so made, to be docketed for trial at the term of the Court next after the docketing thereof, unless the parties can sooner be ready for the trial thereof.

"SEC. 16. Whenever any issue is pending proper to be tried by a jury, a venire for a jury shall issue by order of the Court, or may be issued by the clerk at the request of either party having the right to have the same tried by a jury."

*Clem*, 14 Ind at 221.

[7] The statement was *dictum* because no one had requested a jury trial below and the court rejected the argument on preservation grounds. *Parrish*, 1 Or at 74. Thus, there was no need for the court to speculate as to whether there was a rule of law that would require a chancellor to be bound by a jury's verdict.

equity would have had a right to a jury trial but for the equity court's stay of the legal proceeding.

Faced with an ambiguous statute, we normally would turn to the legislative history. *PGE*, 317 Or at 611-12. However, the territorial legislature has left no legislative history on this topic. Thus, I proceed to the third level of the *PGE* analysis and use canons of statutory construction to resolve the ambiguity. *Id.* at 612.

A common maxim of statutory construction of the nineteenth century was the principle that, when a statute granted a power to a public body on a matter concerning the public interest, that statute imposed an obligatory duty, notwithstanding permissive language such as "may." The Oregon Supreme Court applied that principle in the nineteenth century, explaining

> "that where the word 'may' is used in conferring power upon an officer, court, or tribunal, and the public or a third person has an interest in the exercise of the power, then the exercise of the power becomes imperative.
>
> "In commenting on this subject[,] Endlich on the Interpretation of Statutes, section 310, says: 'But it would be difficult to believe that Parliament ever intended to commit powers to public persons for public purposes, for exercise or non-exercise, in any such spirit. An enactment that a court or person may swear witnesses, or that a justice may issue a summons on complaint of an offense, or the chancellor a commission in a case of bankruptcy, is no mere permission to do such acts, with a corresponding liberty to abstain from doing them. Whenever the act is to be done for the benefit of others, the word may, or any of its equivalents, simply confers a power or a capacity to do the act. It is facultative, not permissive; and neither by its own connotation, nor by force of any legal principle, does it necessarily imply an option to abstain from doing the act. On the contrary, it is a legal or rather a constitutional principle that powers given to public functionaries or others for public purposes or the public benefit are always to be exercised when the occasion arises.' "

*Kohn & Co. v. Hinshaw*, 17 Or 308, 311-12, 20 P 629 (1889); *see also Springfield Milling Co. v. Lane County*, 5 Or 265, 271-72 (1874) (holding that, because the statute at issue

implicated the public good, "may in this statute means must, upon the principle recognized by good authority that, when a public body or officer has been clothed by statute with power to do an act which concerns the public interest, the execution of the power is a duty, and though the phraseology of the statute be permissive, it is nevertheless to be held peremptory").

Applied to the territorial statute at issue in this case, that maxim resolves the ambiguity in favor of interpreting the statute to be a mandate to the chancellor. The statute speaks to a public official—the chancellor—about a matter of public interest—the jury trial. A leading mid-nineteenth century commentator would have shared that opinion with us. Discussing the proper construction of statutes such as the one at issue here, Simon Greenleaf recognized

> "the well known rule of law, that words of permission, in a statute, if tending to promote the public benefit, or involving the rights of third persons, are always held to be compulsory."

Simon Greenleaf, 3 *A Treatise on the Law of Evidence* § 266, 243 (1850).[8] Applying that rule to contemporary statutes in Arkansas and Wisconsin that used language virtually identical to the territorial statute, Greenleaf explained that

> "the precise construction of these provisions, and whether they would justify the Court in refusing to grant a trial of material facts by Jury, when claimed by the parties, yet remains to be settled. Probably few Judges, at the present day, in any state where the law is not perfectly clear against it, would venture to deny such an application, in a case *proper* for a Jury, nor to disregard the verdict, if fairly rendered upon a legal trial. And in proportion to the *duty* of directing an issue to the Jury, is the obligation on the Judge to be governed by their verdict."

*Id.* (emphasis in original). Squaring that idea with the notion that the chancellor can never be bound by a jury verdict, Greenleaf explained that

---

[8] Greenleaf also speculated that "no one will deny that [a jury trial] is a mode of trial highly favored, and intimately connected with the general welfare." Simon Greenleaf, 3 *A Treatise on the Law of Evidence* § 266, 243 (1850).

"this power in the Chancellor to disregard the finding of the Jury cannot exist in any of the United States where the trial of facts, in cases in Equity, is secured to the parties by constitutional or statute law, as a matter of right. The law, in granting such right, where it is seasonably asserted by the party, takes away from the Chancellor the authority to determine any question of fact material to the decision, and refers it exclusively to the Jury; the Judge retaining only the power to apply the law of Equity to the facts found by the Jury, in the same manner and to the same extent as at common law. It is only where no such right of the party is recognized by law, and where the resort to a Jury is left to the discretion of the Judge, in aid of his own judgment, that he is at liberty to disregard the finding of the Jury, or to determine the facts for himself."

*Id.* § 262 at 237.

Based on the foregoing, I conclude that the territorial legislature's intent in enacting the statute in question was to require equity courts to empanel juries and be bound by their verdicts whenever an issue of fact rendered the intervention of a jury necessary. I further conclude that, in light of the chancellor's competence to resolve questions of fact, a question of fact would have rendered a jury necessary only when that fact question was also relevant in a legal proceeding in which the defendant in equity would have had a jury trial right but for the chancellor's injunction of the legal proceeding.

As discussed above, in *Tribou*, the Supreme Court held that the "language of the constitution indicates that the right of trial by jury shall continue to all suitors in courts in all cases in which it was secured to them by the laws and practice of the courts at the time of the adoption of the constitution." 7 Or at 158. The necessary consequence of that rule here is that the Oregon Constitution secures to a defendant in an equitable proceeding a right to a jury trial on any factual question relevant to the equitable proceeding and on which the defendant in the equitable proceeding, as plaintiff in the initial legal proceeding, would have had a right to jury trial but for the equity court's injunction of the legal proceeding. Thus, the constitutional principles recognized by *Beacon Theatres* and the Eighth and Fourth circuits to be embodied

in the Seventh Amendment are also embodied in Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution. That is, the constitution prohibits a court from denying a party its right to a jury trial on a fact question in a legal proceeding by resolving that same fact in its capacity as factfinder in an equitable proceeding.[9]

---

[9] That conclusion is wholly consistent with *Westwood*, 108 Or App at 310. Again, *Westwood* involved two distinct claims—one for breach of contract and one to foreclose a lien—that could coexist. That is, the resolution of one claim would not eliminate the subject matter of the other. *Id.* at 318. In contrast, in a case such as this, the resolution of either the claim or the counterclaim would resolve, for all practical purposes, the other. In that way, this case is more similar to *Sasser v. DeLorme*, 56 Or App 630, 642 P2d 1192 (1982), a case that we explained in *Westwood* was distinguishable from the latter case.

In *Sasser*, the plaintiff had sought an accounting from the defendant, which was an equitable claim, and also had brought claims for money had and received and for conversion, which were legal claims. The jury that was empaneled to try the legal claims served as an advisory jury on the equitable accounting. The jury determined all the claims in favor of the defendant, and the court adopted the jury's advisory verdict on the equitable accounting. On appeal, the plaintiff argued that we should review the accounting claim *de novo*, and find in her favor on the accounting claim.

We declined to do so. We acknowledged that, ordinarily, *de novo* review of an accounting would be appropriate. *Id.* at 634. However, "because of the particular posture of [the] case we adopt[ed] a different approach." *Id.* We explained that "[e]quity cannot disregard the determination in the law action of the legal rights of the parties to funds involved in the accounting. A separate determination of the legal relationship in equity would be tantamount to a collateral review of the jury's findings in the law action." *Id.* Consequently, we held that when the jury found for the defendant on the legal claims, it necessarily resolved the equitable claim. *Id.*

In a case such as this one, it is the resolution of the equitable counterclaim that necessarily resolves the legal claim. We explained in *Westwood* that that case was distinguishable from *Sasser*, a case in which the resolution of the legal claims eliminated the subject matter of the equitable claim. *Westwood*, 108 Or App at 318. By parity of reasoning, *Westwood* must also be distinguishable from this case, in which the resolution of the equitable counterclaim eliminates the subject matter of the legal claims.

To put it another way, although there may have been a common factual question, in the broad sense, between the contract claim and lien foreclosure claim in *Westwood*, it was not the type of commonality that I speak of in this case. Here, I refer to a common factual question that, once resolved by the court sitting in equity, can never be presented to the jury. That is, a fact question on which the defendant in the equitable proceeding would have had a right to a jury trial but for the equity court's actual or constructive injunction of the legal proceeding. In contrast, a claim for lien foreclosure is "irrelevant to a legal claim for breach of contract." *Safeport, Inc. v. Equipment Roundup & Mfg.*, 184 Or App 690, 710, 60 P3d 1076 (2002), *rev den*, 335 Or 255 (2003) (internal quotation marks and citation omitted). That is, there is nothing to prevent two factfinders from answering a factual question common to both a lien foreclosure claim and a breach of contract claim. It is the total deprivation of the opportunity to present the common factual question to a jury in a case such as this that runs afoul of the constitution.

In this case, if plaintiff had a right to a jury trial on the question of the existence and terms of the purported settlement agreement in at least one of its claims against defendants, then the court erred in denying plaintiff's request for a jury trial on that question in the trial of defendants' counterclaim for specific performance.[10] The joinder of the claim and counterclaim is of no import because the Oregon Rules of Civil Procedure, which allow such joinder, ORCP 50, cannot simultaneously infringe on a party's constitutional jury trial right. Thus, I must confront the second difficult issue presented by this case regarding the two historical classes of settlement agreements. Only then can I address whether there was a common question of fact between plaintiff's claims and defendants' counterclaim that required the court, in the equitable proceeding of defendants' counterclaim, to empanel a jury and be bound by its verdict.

For the reasons that I explain below, whether there is a common factual question in both plaintiff's contract claim and defendants' counterclaim turns on whether defendants' reliance on the settlement agreement as a defense in plaintiff's contract action would have been an assertion of a legal

---

Furthermore, as we explained in *Safeport*, *Westwood* did not resolve the question of how to proceed where the jury in a breach of contract claim and a court in a lien foreclosure render wholly irreconcilable verdicts. *Id.* at 713 n 3. Such a scenario may be closer to the posture of this case than of that in *Westwood*, but I need not resolve it at this time.

[10] Although the notion of a modern court, in its equitable capacity, empaneling a jury and being bound by its verdict seems a bit foreign, it is wholly consistent with the Oregon Rules of Civil Procedure. ORCP 51 D provides that, "[i]n all actions not triable by right to a jury, the court * * * may, with the consent of all parties, order a trial to a jury whose verdict shall have the same effect as if trial to a jury had been a matter of right." Thus, the rules specifically contemplate a binding jury verdict in an equitable proceeding—albeit in circumstances not present in this case, specifically, when all parties consent.

Furthermore, ORCP 53 B provides that

"[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or issues, always preserving inviolate the right of trial by jury as declared by the Oregon Constitution or as given by statute."

The dual purposes of that rule are to promote judicial economy and to preserve the right to a jury trial. Both of those goals are accomplished by empaneling a binding jury on a factual question common to the legal and equitable claims and counterclaims.

defense or an equitable defense in 1857. To understand why, one must first understand the historical treatment of settlement agreements.

Unfortunately, as is often the case, the pre-statehood case law is silent on this matter. As best as I can determine, there is no pre-1857 published Oregon decision on a similar issue. Thus, I look to the state of the common law in other jurisdictions. *See Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 129, 23 P3d 333 (2001) ("[T]he content of the common law in 1857 may be divined from a wide range of sources. Cases from other jurisdictions, as well as Oregon cases decided within a relatively short period after 1857, are instructive.").

An agreement involving the discharge of a pre-existing duty is an accord. In antiquity, an executory accord—an accord that had not yet been performed—was not enforceable. Period. *See, e.g., Cushing v. Wyman*, 44 Me 121, 134 (1857) ("Nothing is better established, by the entire concurrence of authorities, than that an executory agreement would constitute no bar to a suit upon a note."); *see also* Joseph Gold, *Executory Accords*, 21 BU L Rev 465, 465 (1941) (citing cases from as early as 1550).[11] The courts of equity, however, took up the slack and would specifically enforce executory accords. *See, e.g., Very v. Levy*, 54 US 345, 357, 14 L Ed 173 (1851) ("At law, a mere accord is not a defence; and before breach of a sealed instrument, there is a technical rule, which prevents such an instrument from being discharged,

---

[11] That treatment of executory accords was driven by the fact that executory contracts in general were not enforceable. Sir William Searle Holdsworth, 8 *A History of English Law* 84 (noting that the conclusion that an executory accord is unenforceable "came from a time before the enforceability of wholly executory contracts was recognized"); Harold Shepherd, *The Executory Accord*, 26 Ill L Rev 22, 28-29 (1931). Of course, with the emergence of assumpsit, executory contracts became enforceable, but executory accords did not follow suit. Gold, 21 BU L Rev at 467-69. Attempts were made at common law to remedy that inconsistency, but to no avail. *Id.* at 469-71. The notion that executory accords are not sufficient to bar an action on an antecedent debt is generally disfavored today by commentators and the *Restatement. See, e.g., id.* at 465 ("The rule is one of the most remarkable archaisms of the Anglo-American common law."); *Restatement (Second) of Contracts* § 281, Reporter's Note to comment b (1981) ("Subsection (2) rejects, as did former § 417, the view that an executory accord is not a defense."). However, we are concerned with the state of affairs at common law in 1857. *Lakin*, 329 Or at 72.

except by matter of as high a nature as the deed itself. * * * But no such difficulties exist in equity.");[12] *Very v. Watkins*, 18 Ark 546, 552 (1857), *aff'd*, 64 US 469, 16 LEd 522 (1860) (explaining that an executory accord was "strictly of equitable cognizance, and would not have been available as a legal

---

[12] Although the Court in *Very* does state the proposition that executory accords were enforceable only in equity, in the very next breath it appears to contradict it, stating that, "[i]ndeed, even a court of law, in a case free from the technical difficulties above noticed, will do the same thing [and hold the creditor to his bargain]," and citing the English case *Bradley v. Gregory*, 2 Camp 383 (1810).

However, *Bradley* did not involve an executory accord like the one potentially at issue here. That case involved a composition—an agreement between a debtor and multiple creditors where there is consideration because the debtor will pay all of his creditors an amount less than they are owed in exchange for the creditors' promises to one another that they will not pursue their claims independently. An Ohio court recognized the significance of that distinction when it wrestled with what to make of the apparently contradictory language in *Very*:

"[The] language of Mr. Justice Curtis, would seem to do away entirely with the doctrine that accord without satisfaction is no bar—says he at page 357: 'On the broad principle that what has been agreed to be done shall be considered as done, the court will treat the creditor as if he had acted conscientiously, and accepted in satisfaction what he had agreed to accept, and what was his own fault that he had not received. Indeed, even a court of law * * * will do the same thing,' and cites *Bradley v. Gregory*, 2 Camp. 383. That was a case of composition between a debtor and his creditors, where it was held, that the debtor could not be sued on the original debt although satisfaction in it had not been made. Lord Ellenborough's language in deciding the case is broader than the facts called for, for it is well settled that cases of composition deeds or agreements form an exception to the general rule. *Kromer v. Heim*, supra; *Good v. Cheeseman*, 2 Barn. & Adol. 328; *Bagley v. Homan*, 3 Bing. N. C. 915, 921; Parsons on Cont., 733, note 1. In this class of cases the new agreement is substituted for the old, the consideration to each creditor being the agreement of the others not to press their individual claims. It cannot be that Mr. Justice Curtis intended to overthrow all the books. Probably all that he meant to be bound by was that as the action before him was in equity, the court could impose equitable terms, and require the parties to do what had been agreed."

*Bloomer v. Cist*, 7 Ohio Dec 337, 343. Thus, the case that *Very* refers to is a case involving a composition—a variety of settlement agreement that was then enforceable at law because it is in the nature of a substituted contract.

Another line of cases relies on *Bradley* to support another proposition that is not applicable here: that a debtor's tender of performance is the equivalent of performance. Based on that premise, some courts have concluded that otherwise executory accords were in effect executed by the debtor's tender of performance and the creditor's refusal to accept it. *See, e.g., Whitsett v. Clayton*, 5 Colo 476 (1880); *Coit v. Houston*, 3 Johns Cas 243 (NY 1802); *Bradshaw v. Davis*, 12 Tex 336 (1854). According to Williston, however, those cases represent the minority rule. *Williston on Contracts* § 73:34. In all events, that line of cases is not applicable here because there is no allegation that defendants ever tendered performance on the purported settlement agreement.

defense"); *see also* Arthur Linton Corbin, 6 *Corbin on Contracts* § 1273, 101-02 (2d ed 1962) (discussing the 19th-century British cases of *Ford v. Beech*, 11 QB 852 (1848), and *Beech v. Ford*, 7 Hare 208 (1848), where the law court refused to recognize an executory accord as a defense but the chancellor specifically enforced the accord).

The American courts carved out an exception to the general rule that an accord is not a bar to an action on an antecedent debt. Gold, 21 BU L Rev at 475. That exception applies when the accord itself is the satisfaction of the antecedent debt. That is, if the creditor accepted the promise of the debtor to perform the accord as satisfaction of the antecedent debt (rather than requiring performance of the accord in order to satisfy the debt), then the accord acts as a legal bar to a suit on the antecedent debt. The commentators refer to that type of accord and satisfaction as a substituted contract.[13] Whether the creditor accepted the accord as satisfaction for the original debt is a question of the parties'

---

[13] Such a contract acts as a complete and immediate discharge of the antecedent debt. *See, e.g.*, Corbin, 6 *Corbin on Contracts* § 1268 at 74. Thus, even if the debtor breaches the accord, the creditor is barred from bringing an action on the antecedent debt. *Id.* § 1275 at 113. That result stems from an anachronistic common-law rule that provides that a cause of action suspended cannot be revived. Shepherd, 26 Ill L Rev at 31-32.

Commentators roundly criticize the perceived overuse of the substituted contract theory by courts to avoid the rule that an executory accord is unenforceable. *See, e.g.*, Corbin, 6 *Corbin on Contracts* § 1269 at 79-82. They acknowledge that the creditor may have, in fact, agreed to discharge the antecedent debt, but fear that too often that intent is erroneously inferred. *See, e.g., id.* The commentators propose that the better rule is to treat the accord as a suspension of the antecedent debt. *Id.* § 1274 at 104-11; Shepherd, 26 Ill L Rev at 40-41. On a breach of the accord by the debtor, the commentators would treat the antecedent debt as revived. *See* Corbin, 6 *Corbin on Contracts*, § 1275 at 111-13; *Restatement (Second) of Contracts* § 281(2) ("Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction. If there is such a breach, the obligee may enforce either the original duty or any duty under the accord.").

Oregon appears to have followed the commentators' recommendation. In *Washington v. Heid*, 264 Or 179, 504 P2d 745 (1972), the plaintiff brought an action for wrongful garnishment and sought to enforce a settlement agreement. The question before the court was whether the settlement agreement was a substituted contract. The court concluded that there was insufficient evidence that the parties intended for the accord to discharge the antecedent debt. The court then explained the consequence of its conclusion:

"There being insufficient proof of a substituted contract, the defendant [creditor] was at liberty to assert the original debt at any time plaintiff was delinquent under the agreement. Corbin expresses the rule as follows:

intent. *See, e.g., Babcock & Russell v. Hawkins*, 23 Vt 561 (1851).

In 1873, the Supreme Court interpreted Oregon law to recognize the distinction between an executory accord and a substituted contract. In *Smith v. Foster*, 5 Or 44, 45-46 (1873), the court observed that the defendant's answer in that case

> "undert[ook] to satisfy one promise by making another, without alleging that the second promise was accepted by the creditor in satisfaction of the first. Such an agreement could not operate as a payment of the note unless it was accepted as such by the party to whom the original promise was made. The answer not only fails to aver that the agreement was accepted in satisfaction of the note, but also fails to aver that it was ever executed or performed by appellant * * *."

---

> " '* * * If it is not agreed upon as a substituted contract, and in many cases it is not, it should be held to operate only as a *temporary suspension* as in the case of other accords. In such cases it is the "performance" of the compromise that is to operate as final satisfaction. If the debtor breaks the compromise agreement, the *suspension* is lifted and the creditor can again enforce his former claim.'
>
> "6 Corbin on Contracts [§ 1268 at 85]."

*Washington*, 264 Or at 185 (emphasis added).

It is unclear whether, in this modern view of an accord as a suspension of the underlying obligation, the executory accord has fully evolved from an equitable to a legal defense. The leading advocate for the suspension doctrine appears to regard an executory accord as an equitable defense still, saying:

> "In any case where an accord has been agreed upon and there has been no material breach by the debtor, when sued by his creditor on the original claim he should plead the accord and his continued readiness to perform it as an *equitable defense*. Under modern code procedure he does not need to describe the defense as 'equitable' or to file a cross-bill for specific performance of the accord. He should not assert in his plea that the original claim is already satisfied, unless the new agreement was itself a substituted contract. But if he pleads the accord and his own continued readiness to perform (sometimes including a tender of performance), any court now having the powers of the former courts of chancery should recognize the facts pleaded as operating as a temporary suspension, and should give judgment for the defendant conditional upon his rendering the performance agreed upon in the accord. This involves the repudiation and abandonment of those cases holding that an accord executory is no defense even though tender of performance has been properly made by the debtor and is wrongfully refused by the creditor."

Corbin, 6 *Corbin on Contracts* § 1274 at 110 (emphasis added; footnote omitted). However, because of our resolution of this case, I need not resolve whether plaintiff would have a jury trial right on defendants' counterclaim if the executory accord, enforceable only in equity at common law, has evolved into a legal defense in Oregon.

*See also id.* (stating that the applicable rule was "well settled"); *Ohlson v. Steinhauser*, 218 Or 532, 540, 346 P2d 87 (1959) (interpreting *Smith* to be consistent with the rule that executory accords are not enforceable at law, whereas substituted contracts are). Despite the fact that *Smith* was decided 16 years after 1857, "nothing in the court's opinion * * * suggest[s] that the holding was novel or that the decision marked a departure from any previous decisions or jurisprudence on the subject." *Smothers*, 332 Or at 131.

Hence, I infer that, in 1857, the common law of Oregon recognized the distinction between an executory accord, which was enforceable only in equity, and an accord that acts as satisfaction of the antecedent debt, which was a legal defense. *See id.*

Thus, whether defendants' counterclaim relying on the purported settlement was the assertion of a legal defense or an equitable one depends on whether the purported agreement was an executory accord or a substituted contract. If the parties intended the purported settlement to be a substituted contract, then defendants' reliance on the settlement agreement amounts to a legal defense. If that is the case, then there is a common factual question between plaintiff's contract claim and defendants' counterclaim, specifically, the existence of the settlement agreement and its terms. Consequently, if the parties intended the purported settlement to be a substituted contract, then plaintiff had a right to a jury trial on the question of the settlement agreement's existence and terms, and the trial court erred in denying plaintiff's request for a jury trial.

In contrast, if the parties intended the purported settlement to be an executory accord, then defendants have asserted what would have been in 1857 an equitable defense at best. That is, the existence of the settlement agreement would have been no legal bar to plaintiff's contract claim and defendants would have had to seek equitable relief by filing a new suit in equity and asking the court to enjoin plaintiff from prosecuting his legal claims. If the purported settlement agreement was, in fact, an executory accord, then there are no common factual questions in plaintiff's contract claim and

defendants' counterclaim. In plaintiff's contract claim, the existence or nonexistence of an executory accord would have been wholly irrelevant in 1857. Consequently, if the parties intended the purported settlement to be an executory accord, then there are no common factual questions in plaintiff's contract claim and defendants' counterclaim, and the trial court did not err in refusing to grant plaintiff's request for a jury trial.

In Oregon, whether an equity court has "jurisdiction" over a claim or defense—that is, whether a claim or defense is equitable in nature—is determined by looking at the pleadings. *Thompson v. Coughlin*, 329 Or 630, 637-38, 997 P2d 191 (2000); *McDonough v. Southern Or. Mining Co.*, 177 Or 136, 149, 159 P2d 829 (1945); *Jackson County Federal Savings*, 95 Or App at 605. That general approach is consistent with *Boston & Maine R. R. v. Union Mut. Fire Ins. Co.*, 83 Vt 554, 77 A 874 (1910), a case that presented the issue whether a settlement agreement was equitable or legal in nature. The Vermont court concluded by looking at the pleadings that, because the bill in equity included "nothing showing an intention or understanding by the parties that anything short of the performance of the agreement should bar an action on the original claim, or that the promise should settle the controversy," the plaintiff did not have an adequate remedy at law in the form of a substituted contract defense, and, hence, the settlement agreement was equitable in nature. *Id.* at 558. Thus, to determine the nature of defendants' affirmative defense, we must look to defendants' answers, in which they assert the purported settlement as an affirmative defense, and plaintiff's reply to that affirmative defense.

Defendants made the following relevant allegations to support their affirmative defense:

"112.

"On February 22, 2001, Dan McDowell, President and owner of McDowell Welding & Pipefitting, agreed to a settlement of all the claims against BE&K and US Gypsum in connection with the US Gypsum construction project.

"113.

"The settlement provided for US Gypsum to pay McDowell the total of $896,000, including direct payments to McDowell's unpaid subcontractors and suppliers, in exchange for a release of the claims McDowell is now pursuing against BE&K.

"114.

"The agreement reached between the parties on February 22, 2001, was a compromise of McDowell's disputed and unliquidated claims against US Gypsum and BE&K."

Plaintiff's reply denied those allegations.

In this case, the pleadings are ambiguous as to whether the parties intended the purported settlement to be an executory accord or a substituted contract. Paragraph 113 of defendants' answer, quoted above, could plausibly be interpreted to allege that the plaintiff would not release defendants from liability until their promise to pay was performed (resulting in an executory accord). However, other allegations lend support to an interpretation of the purported settlement as a substituted contract.

For example, defendants alleged that "[t]he agreement reached between the parties on February 22, 2001 was a compromise of [plaintiff's] *disputed and unliquidated claims* against [defendants.]" (Emphasis added.) The Supreme Court has observed that

"where the original obligation is unliquidated and the subsequent agreement is for a definite sum, courts will usually hold the subsequent agreement to be a substituted contract. *Mays v. Stegeman*, 213 Ky 60, 280 SW 464 (1926). Such distinctions make sense because it is unreasonable to assume that, without further evidence, a creditor who has an immediate right to an undisputed sum will substitute a debtor's promise to pay a lesser sum therefor without the right to assert the original debt if the subsequent agreement is not carried out according to its terms. On the other hand, where there is a *disputed or unliquidated claim* it is reasonable to assume in the absence of further testimony that a subsequent agreement for a specific amount was probably intended as a substituted contract."

*Washington v. Heid,* 264 Or 179, 184-85, 504 P2d 745 (1972) (footnote omitted; emphasis added); *see also* Gold, 21 BU L Rev at 479 ("Where his claim is unliquidated, a plaintiff will be more likely to accept the defendant's promise in satisfaction, than where it is liquidated. Again, where his claim is disputed, he will be more willing to accept the promise in satisfaction than where it is undisputed." (Footnotes omitted.)). Admittedly, in a later case the Supreme Court cautioned that its observation in *Washington* was "dictum" and "should not be taken to mean that there are separate rules of law governing agreements to settle liquidated and unliquidated claims." *Savelich Logging Co. v. Preston Mill Co.,* 265 Or 456, 464 n 5, 509 P2d 1179 (1973). I cite the observation here not to apply a separate rule of law to this unliquidated claim but to point out, instead, that the circumstances surrounding this purported settlement agreement suggest that the parties may have intended it to be a substituted contract. *See Lenchitsky,* 217 Or at 490 (noting that, in 1936 and 1957, the Supreme Court approved the statement that "[t]he intention of the parties [as to the effect of the accord], which is of course controlling, must be determined from all the circumstances attending the transaction").

Defendants' allegation that the terms of the purported agreement provided that defendants were to make payments directly to plaintiff's various creditors also suggests that the purported settlement agreement may have been a substituted contract. Citing several common-law cases from the nineteenth and twentieth centuries, Professor Gold stated that "[w]here the accord introduces a new party it may be presumed that there is an intention to extinguish the former liability." Gold, 21 BU L Rev at 480.[14]

In short, the pleadings are ambiguous as to whether defendants' reliance on the purported settlement invoked the equitable jurisdiction of the court or whether defendants asserted a legal defense. The question now becomes what to do in the face of such ambiguity.

---

[14] The Supreme Court acknowledged Professor Gold's expertise in that area in *Ohlson,* 218 Or at 538.

The Oregon courts have not identified the appropriate course of action when confronted with an ambiguity of that kind. Other jurisdictions, however, have (albeit in other contexts). The majority rule appears to be that, in deference to the constitutional nature of the right to a jury trial, all doubts should be resolved in favor of a jury trial. *See, e.g., Lee Pharmaceuticals v. Mishler*, 526 F2d 1115, 1117 (2d Cir 1975) (holding that "the federal policy favoring jury decisions of disputed fact questions impels us to resolve any doubts in favor of the right to a jury trial" (internal quotation marks and citation omitted)); *Dixon v. Northwestern Nat. Bank of Minneapolis*, 297 F Supp 485, 489 (D Minn 1969) ("In close cases where there is doubt * * * the court should favor the granting of a jury trial to insure constitutional rights."); *Southern Leisure Homes, Inc. v. Hardin*, 742 So 2d 1088, 1090 (Miss 1999) (explaining that, in cases in which some doubt exists as to whether a complaint is legal or equitable in nature, the better practice is to try the case in circuit court rather than chancery court to avoid infringing the constitutional right to a jury trial).

The Washington Constitution's civil jury trial provision is textually similar to Oregon's and has been interpreted to require a historical analysis, as has Oregon's. *S.P.C.S., Inc. v. Lockheed Shipbuilding and Const. Co.*, 29 Wash App 930, 933, 631 P2d 999 (1981). Washington courts have made clear that, colloquially speaking, the tie goes to the right to a jury trial. *Auburn Mechanical, Inc. v. Lydig Const., Inc.*, 89 Wash App 893, 898 951 P2d 311 (1998) ("Any doubt [about the nature of a claim] should be resolved in favor of a jury trial, in deference to the constitutional nature of the right."); *S.P.C.S., Inc.*, 29 Wash App at 934 ("If the nature of a case is doubtful, deference should be given to the constitutional nature of the right and a jury trial should be allowed."). I am persuaded that Oregon courts should give similar deference to the constitutional nature of the jury trial right under Article I, section 17, of the Oregon Constitution, and resolve all doubts in favor of a jury trial.

With that in mind, I conclude that the trial court erred in denying plaintiff's request for a jury trial. The pleadings are ambiguous as to whether the purported settlement agreement was equitable or legal in nature, so I assume that

it was available as a legal defense. Because it was a legal defense, in 1857 there would have been a common question of fact between plaintiff's legal contract claim and defendants' counterclaim in equity—that is, the existence and terms of the purported settlement.[15] Thus, plaintiff had a right to a jury trial on that question, on which the court's ruling infringed.

The court's error necessarily means that its entry of summary judgment on plaintiff's claims in favor of defendant should not stand. That ruling was based wholly on the court's entry of a limited judgment in favor of defendants on their counterclaim. Once that limited judgment falls (as it should for the reasons explained above), it is plain that all of the court's rulings based upon it should fall.

---

[15] It might be that a legal claim and an equitable counterclaim or defense share a common question of fact today, whereas they would not have in 1857. My focus in this case on 1857 should not be understood to foreclose the possibility that, in the hypothetical scenario just described, a party would have a constitutional right to a jury trial. I need not answer that question in this case because my analysis shows that plaintiff would have had a right to a jury trial on the question of the existence and terms of the purported settlement agreement in 1857, and, under *Lakin*, that is sufficient to guarantee it a jury trial today.